LEONA ORR, Administratrix, Appellant, v. DES MOINES ELECTRIC LIGHT COMPANY et al., Appellees.

No. 40462.

OCTOBER 27, 1931.

C. F. Dickson and T. J. Bray, for appellant.

Bradshaw, Schenk & Fowler and McNeil & Scovel, for appellees.

MORLING, J.—This case was before this Court on a former appeal. Orr v. Des Moines Electric Company, 207 Iowa 1149. Judgment in favor of the plaintiff was there reversed because plaintiff in her petition specified the particular acts of negligence on which she relied and was thereby precluded from availing herself of the benefit of the doctrine of res ipsa loquitur. On remand she struck out of her petition the specifications of negligence and went to trial on her general allegations. Defendant's first contention is that the amendment set up a new cause of action, which was barred by the statute of limitations.

The petition alleged that defendant conducted into the town and about the streets a high and dangerous current of electricity of about 2300 volts.

"Par. 6. That the defendant, Des Moines Electric Light Company, and the defendant, C. K. Gunnar, negligently permitted the transformers, poles, wires and insulation on the wires to become defective, and the insulation on said wires to become worn and defective, so that on June 11, 1926, a high and dangerous current of electricity was conducted from the wires of said company which carried a high and dangerous current, to the wires which should have supplied the home of said Harold Bone with electric current of such strength as was necessary for lighting only."

"Par. 8. That in the performance of his (intestate's) duties * * * it was necessary for him to use the light current furnished to the house * * * which light current is harmless to human life. That when he was using said current of electricity so furnished by the defendants, the defendants negligently permitted and allowed a high and dangerous current of electricity to be conducted over the wires leading into the house of said Harold Bone and into said house, which high and dangerous current of electricity killed said Clarence Orr."

By the amendment plaintiff merely struck from her petition Paragraph six.

The cause of action was negligence in permitting a high and dangerous current of electricity to be conducted to the consumer's wires. By Paragraph 6 plaintiff undertook to specify wherein defendant was negligent in permitting the excessive charge or current. Because she set out the particulars of the

alleged negligence which she claimed, she could not assert that she did not know them and that defendant was in position to know the facts and she was not. Unless she was uninformed she was not entitled to the benefit of the doctrine of res ipsa. That is the reason why under the specific allegations she was precluded from taking advantage of that doctrine. Orcutt v. Century Building Company, 99 S. W. 1062, 201 Mo. 424, 8 L. R. A. (N. S.) 929; Byland v. E. I. Du Pont De Nemours Powder Company, 144 Pac. 251, 282, L. R. A. 1915F 1000, 93 Kans. 288.

By the petition defendant was fully notified of the cause of action set up, which was negligence in permitting excessive charge. By the amendment the identity of the cause of action was not changed. At most the amendment merely operated to expand or amplify what was alleged. The amendment did not set up a new cause of action. Lammars v. Chicago G. W. R. Co., 187 Iowa 1277; Plantz v. Kreutzer, 192 Iowa 333; Blake v. City of Bedford, 170 Iowa 128; Knight v. Railway Co., 160 Iowa 160; Hueston v. Preferred Acc. Ins. Co., 184 Iowa 408; New York Central & H. R. R. Co. v. Kinney, 260 U. S. 340, 67 L. Ed. 294.

II. Plaintiff in the circumstances of this case in order to recover had the burden of proving:

1. That the death of decedent was caused by electric shock. 2. That the fatal charge was caused by defendant. 3. That death was caused not by the ordinary and reasonable lighting voltage of 110 to 120 volts (for defendant would rightfully charge its customers' wires with such voltage) but by a greater and excessive voltage. 4. That the fatal excess charge was attributable to defendant's negligence.

1. Defendant in argument properly concedes "that a jury might find that death was due to an electric shock," and again "It may reasonably be inferred from the evidence that his (intestate's) death was due to an electric shock."

2. It is not disputed that if death resulted from electric shock the current causing death was produced by defendant.

3. Defendant's main contention is that the fatal shock, if such was the cause of death, might have resulted from the ordinary voltage of 110 to 120, and that it is not shown that such voltage would not produce death, but on the contrary it appears that death might be so produced.

4. Furthermore, defendant contends that on the evidence it was impossible that the consumer's wire could have been over-charged and defendant was not negligent.

We will consider three and four together. ·

Decedent was found by the witness Bowers prostrate on the unexcavated ground beneath the floor of the Bone residence where he had been working on a plumbing job. In his hands and under his body was an electric light bulb and socket pro-tected by a screen and connected with the wiring of the resi-dence, the current for which was furnished by defendant and was on. The weather had been hot and dry for a long time. When Bowers first touched the body he felt no shock. Then, as he says, he "took hold of his bare arm and then I got an electric shock. I got enough of a shock to make me want to let loose. * * * No apparent effect afterwards. * * * The lamp * * * was held in the region of his heart. The inside of his right hand was severely burned. The left hand was slightly burned. * * * The light bulb was pressed tightly against his body."

A physician was called. The physician testified:

"Rigor mortis had set in very strong in the arms. * * * An electrical charge would produce it. * * * His clothing was wet,· his pupils dilated, he had a livid dark color, his lips were more or less swollen, right where his heart would be there was an area of his body that had a baked appearance, whitish like the breast of a chicken that had been thoroughly cooked. The hands * * * showed burns at the edge of the skin in places and the outer edge had commenced to slough a little. He had been dead for an hour or so. * * * Q. Were those burns such as to show it could have been caused by only a voltage of 110 in your opin-ion? A. I do not think that would, just a single connection. You want a continuous passage. * * * I would not want to qualify as to the effect of 110 volts for a long time—have had no observation."

The Doctor thought that it was 10 or 10:30 when he saw the body.

A professor of electrical engineering in the State University testified:

"The principal factors which determine electrical power

are voltage and current. * * * You may have electrical voltage without current. The common voltage used in house lighting and operating washing machines and toasters and things of that kind is 110 to 120 volts. * * * 110 to 120 volts of electricity will not injure a human being further than giving a slight shock. Q. About how much voltage of electricity is required to produce a severe injury or death to a human being? A. It is rather uncertain. Somewhere between 500 to 1000 volts or above. * * * Q. You may state whether or not in your opinion it would be possible for a person to be electrocuted by holding the lamp and shield of Exhibit A in his hands, or in his hands against his chest lying upon the ground, on dry ground, on a warm day, a person perspiring, with only 110 to 120 volts of electricity on the secondary wire. A. I should say it would be very improbable. Q. Assuming those same facts to be true, what is your opinion as to whether or not a person in that position, even though it were over an hour's duration or more, would burn a spot on his breast until it was boiled like chicken meat? A. I should say it would not be possible. Q. What is your opinion as to whether a person holding that apparatus in his hands lying in the position I have described in the previous question would burn his hand to the extent that the skin would break and become charred with only 110 to 120 volts of electricity? A. I should say he would not. * * * It is extremely remote that a contact with electricity of 110 volts pressure would cause a fatal injury. I have heard of one instance where a man has been killed by 110 volts. * * * Q. Now, professor, assuming that a man was in contact with 110 volts and that contact had continued for the duration of an hour, is it not more likely the constant flow of electricity through his body would have more effect than if he had merely a contact? A. I should say not. Q. Isn't it true that duration—passing of electricity through his body has some effect upon whether or not it is fatal? A. Might have a very small effect. * * * A current passing through a man for an hour would have no different result than one passing through two minutes. * * * Q. Upon what authority is your statement made that it takes over 500 volts of electricity to cause death? A. Why, because practically all of these cases that cause death the evidence shows that the voltage was somewhere about 500 volts. I know that repeatedly get shocks at

110 volts or 200 or 250 volts without being killed. In fact I have had several shocks myself. A case occurred in England some fifteen years ago where a person in a bath house was killed with 120 volts. I have known plenty of people that had shocks up to 500 volts and were not killed. I know where plenty get shocks with 110 and are not killed. * * * I have held a fifty watt lamp for a good many hours and know that the temperatures which you get are not high enough to cause the burning of the kind which was described. * * * The determining factor of the extent of burning from electricity is the amount of current per unit area of contact. It is the product of the voltage and amperes that burns. * * * By virtue of a contact of the primary and secondary wires it might be possible to have on the secondary system either 1150 or 2300 volts. * * * The ground wire is for a safety device in an electric distribution system. * * * A resistance up to 25 ohms constitutes an adequate ground. The contact resistance between the wire and the earth has to be under 25 ohms. The safety rules require that it be under 25 ohms. That is the measure of resistance. If the earth in the neighborhood of the ground should dry out that would raise the ohmage. If the resistance was raised until it was in excess of 25 ohms, it would not be an adequate safety device. * * * If a ground connection is of a high resistance, the voltage between the secondary wires and earth would be more than if the ground were of a low resistance. The whole secondary wiring system in the house is raised. If the resistance of the ground is raised, it might become a dangerous voltage. * * * If the connection between the primary and secondary is by means of a short section of a limb of a tree, a person touching the secondary can receive a dangerous shock. * * * The man (that was killed with 110 volts) was working at an ice cream stand at a fair. The ground was soaked with salt water, * * * and his hands were wet. * * * He took hold of the lamp socket, his feet were wet, the secondary system was grounded, and he was killed. * * * As near as I can tell from the examination, the socket (the lamp held by intestate) is in good condition. * * * Q. Now you may state whether or not the condition of the little piece of wire (in the lamp socket) could be caused by a voltage of more than 500 volts. A. It could.''

He further testified:

"The primary wires running through the trees had insulation worn off. With the construction of the wires at that point as I have described them to be, it could be possible that an electrical contact would have occurred there on June 11, 1926. A branch of a tree is more or less an electrical conductor, especially in summer time when you have plenty of sap and the bark is green, growing bark, so a branch of a tree coming in contact with two wires will form an electrical connection between the two wires, especially if one of the wires happens to be a high voltage wire. The tree branches connect the primary and secondary together so that they are apt to have the same voltage or substantially that. An electrical contact produced in this way may be either intermittent or of some duration."

The primary wires at the place in question were strung on cross arms and carried a voltage of 2300. Between them and about 12 inches apart were the three secondary wires. The neutral secondary wire was grounded. The wires were strung through tree tops. The insulation in the trees was rubbed or broken off. There was evidence that "there were several of the tops of the branches that was rubbing on the wires there"; that "just before Clarence Orr was killed the tree in front of the McMeeken house that they have electric wires running through, was on fire."

Defendant's local superintendent testified that the effectiveness of grounding depended entirely upon the ohmage resistance of the ground; that societies recommend that if the ground is adequate the ohmage must not be over 25; that "the ohms depend on the moisture in the soil to some extent. * * * A. And when we have a long dry spell such as we had in June, 1926, the ground dries out and becomes packed, the moisture leaves and the ohmage raises. A. Not where this one was. Q. How do you know? A. It was in clay. Q. Won't clay dry out? A. Not with black loam on top. Q. It can't be done? A. It won't under natural conditions." That prior to June, 1926, there had been no rain for two or three months; that there was some fire on the tree in front of McMeeken's house; "that after Orr was killed we trimmed the trees to avoid contact."

Defendant produced numerous witnesses whose testimony

was to the effect that at about nine o'clock or before on the morning of the accident defendant's employees tested the meters in the Bone house and later other houses in the neighborhood and found no evidence of excessive voltage; that defendant had had no complaints; that the secondary system was grounded according to standard requirements; that the ground rod was in clay and the effectiveness of the grounding was not affected by weather conditions; that with such grounding it was impossible that the voltage in the secondary system should raise above 110 to 120 volts. They made no test for moisture, did not dig in the ground or test the grounding. They reconstructed the system in controversy pursuant to orders made the next day after the accident, put in a new ground rod but left the old one in place. This was dug out before the last trial and offered in evidence. There is no evidence of the exact condition either of the connection with the grounding rod at the time of the accident (though general evidence that it was according to standard requirements) and no evidence as to the condition of the earth around the ground rod, except the statement generally "The soil in which the ground rod was driven was black loam, common black soil, for a depth of between one and two feet. Below that, it was yellow clay to the end of the rod." On the night after the accident there was a heavy rain.

The foregoing is only a brief outline of the evidence:

Electricity is a dangerous instrumentality and yet under many safeguards is in common use. The voltage at the point of production, usually terrific, is reduced by successive stages until it is comparatively harmless as it enters the homes and business places of the consumers. Millions of bulbs such as that found in the hands of the deceased are in common use and commonly handled while in use by all sorts of people from the undeveloped child to the experienced adult. Drop cords are likewise constantly changed from one connection to another. Reducers and conducting wires are constructed high in air, underground or in walls and are not under ordinary observation. Defects in them are not ordinarily observable to the user of the current. (Contributory negligence is not here argued.) Ordinary care in the distribution of the current means care commensurate with its hazards and dangers. Though millions of human bodies are in frequent contact with ordinary lighting bulbs and drop cords,

severe and fatal injuries are very infrequent. When such injuries do occur, unless the body was so arranged as to be an unusually good conductor, they suggest want of care in transmission and reduction from the dangerous to the consumers' voltage. It is expected that the light company is fully informed as to the conditions of its apparatus and able to show the precautions and care taken of it. It is not expected of the consumer that he is informed or can put his finger upon the specific acts or omissions from which the injury resulted. There is substantial evidence tending to prove that intestate's death was due to an excessive electrical charge in the wire with which he was in contact. The circumstances to which reference has been made tend to prove want of ordinary care on the part of the defendant because of which excessive voltage was transmitted to the consumer's wire. As the case must be retried we refrain from more particular comment on the facts. The plaintiff in the facts of this case was entitled to the benefit of the doctrine of res ipsa loquitur. Defendant contends that it as matter of law rebutted any prima facie case that plaintiff may have made. The value of the circumstances and the opinions upon which defendant relies as compared with those upon which the plaintiff relies, the weight to be given to the testimony of the various witnesses and the ultimate conclusions of fact to be drawn from all of the evidence were for the jury, not for the court to determine. These matters under very similar conditions have been so fully considered in our recent cases that further discussion would add little or nothing to what has been previously said by this Court. Duncan v. Fort Dodge G. & E. Co., 193 Iowa 1127; Welsch v. Frusch L. & P. Co., 197 Iowa 1012; Graves v. Interstate Power Co., 189 Iowa 227; Orr v. Des Moines Electric Co., 207 Iowa 1149; Beman v. Iowa Electric Co., 205 Iowa 730; Anderson v. Fort Dodge, Des Moines & Southern R. Co., 208 Iowa 369.

The court should have sent the case to the jury. *Id.*—Reversed.

WAGNER, J., not participating.

FAVILLE, C. J., and KINDIG, STEVENS, and EVANS, JJ., concur.