Alfred Krueger, Appellee, v. Thomas J. Friel and Charles C. Renshaw, Trustees, etc. et al., Trading as Chicago Surface Lines, Appellants.

Gen. No. 43,904.

558

Opinion filed February 26, 1947. Released for publication March 20, 1947.

JAMES O. DWIGHT, ERWIN H. WRIGHT, ARTHUR J. DONOVAN and CHESTER A. WYNNE, all of Chicago, for appellants; WILLIAM J. FLAHERTY and WILLIAM S. ALLEN, both of Chicago, of counsel.

IRVING G. ZAZOVE and LOUIS B. GOLDBERG, both of Chicago, for appellee; IRVING G. ZAZOVE, of Chicago, of counsel.

MR. JUSTICE BURKE delivered the opinion of the court.

Alfred Krueger sued the trustees of the corporations doing business as Chicago Surface Lines for damages for personal injuries received while a passenger on one of their street cars. When the case was called for trial, a motion for change of venue was denied. The case then proceeded to trial. At the close of plaintiff's evidence the court directed a verdict for defendants and entered judgment accordingly. This judgment was reversed and the cause remanded for a new trial on the ground that the court erred in refusing to allow the petition for a change of venue. *Krueger v. Cummings,* 314 Ill. App. 492. On the second trial the court directed a verdict for defendants at

the close of plaintiff's case and judgment was entered thereon. We reversed the judgment and remanded the cause for a new trial. *Krueger v. Richardson,* 326 Ill. App. 205. The trial judge granted the motion for a directed verdict upon the theory that the doctrine of *res ipsa loquitur* did not apply and that plaintiff had made no showing of negligence by defendants. We held that the doctrine of *res ipsa loquitur* did apply. Upon the retrial of the case, following the second remandment, defendants introduced evidence after the plaintiff had rested his case in chief. This trial resulted in a verdict finding the defendants guilty and fixing plaintiff's damages at $8,000. Motions by defendants for a directed verdict, for judgment notwithstanding the verdict and for a new trial were overruled, and judgment was entered on the verdict. Defendants appeal.

In the early morning of July 8, 1939 plaintiff was riding in defendants' southbound Halsted street car as a fare-paying passenger. The car was half filled with passengers. As the car stopped at 26th street, an automobile driven by Frank Biondi and proceeding in a northerly direction on Halsted street scraped or bumped into the left or east side of the street car. There was testimony that immediately thereafter there was an explosion in the controller at the rear of the car, which sounded like a bolt of lightning and flames enveloped the back end of the car; that bolts of electricity began shooting from the rear to the front of the car and vice versa; that the front-end controller also exploded and began to blaze; that bolts of electricity shot from the ceiling around the lamps to the floor and went along the seats and walls of the car; and that passengers became panic stricken, some falling to the floor. Plaintiff testified that he received an electric shock to his leg, back and side while he was seated by a window about the middle of the car. He testified that he heard an explosion and saw a flash

of light that appeared to be in front of his face, which blinded him; that he was rendered unconscious; that his hat, tie, shirt and the seat of his trousers were left with brown marks, holes and burns; that the street car was burning and that the fire had to be extinguished by the fire department.

Two experts testified for the defendants. Martin McMahon, an engineer employed by the Board of Supervising Engineers, testified in substance, that the street car on which plaintiff was a passenger was No. 5229; that it is one of the 5200 series; that the electricity comes in from the trolley down to the circuit breaker, then to the fuse box, then to the controller and from there to the motor; that the fuse box is of wood lined with asbestos and contains the fuse; that the purpose of the fuse box is to break the circuit when the electricity becomes too heavy and prevent the burning of the insulation of the motors; that there are two fuse boxes, one in the right front and the other in the left rear; that it is located in front of the truck and to the rear of the platform; that it is located about six inches under the car; that it is an approved type of fuse box; that an insulated cable leads to the fuse box, having a type of strand approved by the American Electric Railway Association; that the wires that come up in the interior of the car are in wooden conduits; that there are no exposed wires in the car; that wood is not a conductor of electricity; that the seats in the car are approved, standard seats; that they have a steel base with a metal frame; that the floors are of wood; and that there are no electrical connections near or in close contact with the seats.

The other expert, Robert Manville, testified that he is an engineer employed by defendants; that he inspected the car a few hours after the accident; that there was evidence of external violence to the fuse box on one end of the car; that there was evidence of arcing on the outside of the car at the location of the

fuse box; that by the term "arcing" is meant an electric flash; that part of the outside of the car had been burned away immediately above the fuse box, which had been disconnected; that there were scrape marks along the side of the car and bent draw bar hooks on one side; that the left rear seat at the end of the car where the fuse box had been, had evidence of smudge; that the board at the rear end of the seat was scorched; that the center portion of the platform, immediately above where the conductor stands, was scorched; that it must have come from the watt meter which is near the ceiling; that there was a scorch mark on the ceiling of the rear platform; that there was a scorch mark on the inside of the car roof; that the left rear seat had no scorching, but was smudged; that the car had rattan seats attached to the wooden floor by means of a pedestal; that the heaters are located on the side of the car underneath a person's foot; that they are placed in a metal casing for the protection of the heaters; that the power for the heaters is tapped off the trolley wire to a fuse, then down the center part to the end of the long seat; that during the summer months the fuses to the heaters are taken out; that when the fuses to the heaters are taken out, "it kills them"; that they are attached to the grounds and are "dead"; that they are taken out in April and returned in October or November; that the route of power for a street car is through the fuse which is connected with a No. 1 cable; that it then goes down about the bulkhead and runs along the left hand side of the front platform over the motorman's head, then through the switch around the other side of the platform near the ceiling in a wooden affair; that it goes down to about the level of the sand box in front of the long side seat; that it then goes into the space underneath the long seat which was smudged; that it goes into a conduit there and out to the fuse box; that from the other

terminal of the fuse box it goes underneath the platform to another coil, then to the controller where the voltage is controlled that is sent to the motors; that from there it goes to the resistance and the motors and then down to the rail, which is a ''ground''; that the cable comes through the trolley pole, then down off the roof to the space over the folding doors to a canopy switch on the inside of the platform over the motorman's head, then around the other side to the corner post and down the corner post to the bottom of the body of the car; that it then goes back to a space underneath the long seat from where it goes through a conduit to the fuse box; that it goes through a conduit when it enters from the inside of the car to the outside; that a standard strand cable is used to conduct the electricity, having a high current capacity wire; that the type of cable used in the car is like an ordinary lamp cord in a home; that around the wire there is a rubber insulation and on the outside an impregnated cotton braid; that the insulation is standard and has been in use for years; that when the witness inspected the portion of the cable underneath the corner, it was against the frame of the body, ''which is as good a ground as the rail or trucks, or wheels''; that it is ''dead ground''; that the cable was annealed; that that means it had been heated to a red heat, after which it had cooled off; that annealing makes it lose its life; that the fuse box that was knocked off the car is a wooden box lined with asbestos sheeting; that inside are two wedge terminals; that a ribbon fuse is inserted between the wedges; that when there is an overheating of the motors, the fuse will blow; that the bottom of the box is open to the air; that when a fuse blows, it blows out in the center and blows down; that the wires for the lights are tapped from the regular trolley wire; that they come in to the canopy over the motorman's head; that they branch off from the

switches around the edge of the platform to a wooden box over the sides of the car; that there are two or three overhead lights in the center of the car; that there is a wooden conduit going along the top of the car in which the wires are encased and from which the wires are tapped out for each light; that there was no exposed wiring in the interior of the car; that the flooring is of wood; that wood is not a conductor of electricity; that when he saw the car it was perfectly dry; that the fuse box is located where it is because it is in a handy position to attach a new fuse when one blows out; that they are not inside the car because there is a flash when one burns out; and that once a fuse breaks, the circuit is broken and the current stops.

The leading case on the doctrine of *res ipsa loquitur* is *Scott v. The London Dock Company,* Vol. XLIII, Law Journal, Part II, 1865, p. 220. Scott, the only witness, testified that as he, in the exercise of his duty as a custom-house officer, was passing under a doorway on defendants' premises, some bags of sugar fell on him from a crane which was fixed over the doorway. The defendants offered no explanation of the cause of the bags falling. The trial judge directed a verdict for defendants on the ground that there was no evidence of negligence. The Court of Exchequer granted a new trial. On appeal to the Exchequer Chamber, speaking through Mr. Chief Justice ERLE, that court said (222):

"The majority of the Court have come to the following conclusion: that there must be reasonable evidence of negligence; that where the thing is solely under the management of the defendant or his servants, and the accident is such as, in the ordinary course of things, does not happen to those who have the management of machinery and use proper care, it affords reasonable evidence, in the absence of explanation by the defendants, that the accident arose from want of care."

The court affirmed the judgment and directed a new trial. Our Supreme Court in *Feldman v. Chicago Rys. Co.,* 289 Ill. 25, said (34):

"The doctrine of *res ipsa loquitur* may be stated thus: When a thing which has caused an injury is shown to be under the management of the party charged with negligence and the accident is such as in the ordinary course of things will not happen if those who have such management use proper care, the accident itself affords reasonable evidence, in the absence of an explanation by the parties charged, that it arose from the want of proper care. . . . The rule is that negligence is never presumed, but that the circumstances surrounding the case where the maxim of *res ipsa loquitur* applies, amount to evidence from which the facts of negligence may be found; that is, in a case within the maxim of *res ipsa loquitur,* proof of the circumstances of such case and of the injury constitutes a *prima facie* case of negligence, and will justify a verdict unless such *prima facie* case is overcome by proof showing that the party charged is not at fault. (*Chicago Union Traction Co. v. Giese, supra; Chicago Union Traction Co. v. Newmiller,* 215 Ill. 383; *Chicago City Railway Co. v. Rood,* 163 id. 477; *New York, Chicago & St. Louis Railroad Co. v. Blumenthal,* 160 id. 40; *Hart v. Washington Park Club,* 157 id. 9.) The burden rested upon defendants in error to overcome the presumption of negligence arising from the circumstances in this case. The record contains no evidence explaining the cause of the accident or overcoming the presumption of negligence."

In the instructions prepared by the parties and submitted to the jury, the parties recognized that the burden of proof was on the plaintiff. From the pleadings the court determines which party is required to prove an issue by a preponderance of the evidence. Legal presumptions do not shift the burden of proof. Their

only effect is to create the necessity of evidence to meet the *prima facie* case created thereby, and which, if no proof to the contrary is offered, will prevail. The burden of proof,—meaning the obligation to sustain the truth of the claim affirmed by a preponderance of evidence,—rested on the plaintiff throughout the trial. *Helbig v. Citizens' Ins. Co.,* 234 Ill. 251, 257. In *O'Hara v. Central Illinois Light Co.,* 319 Ill. App. 336, the court said (343):

"Defendant contends that having introduced such evidence, all presumptions of negligence vanished, and that under the authority of *Bollenbach v. Bloomenthal, supra,* it was error for the court to deny the defendant's motion for a directed verdict at the conclusion of all the evidence. We do not agree with this contention. We cannot say as a matter of law that in this case all presumptions of negligence vanished, but it is our opinion that the question of whether the defendant offered such explanation of the accident as to relieve itself of the presumption of negligence was a question of fact for the jury. (See *Alton Railway & Illuminating Co. v. Foulds,* 81 Ill. App. 322; *Drake Standard Mach. Works v. Brossman,* 135 Ill. App. 209.) In *Humphrey v. Twin State Gas & Electric Co.,* 100 Vt. 414, 139 Atl. 440, 445, 56 A. L. R. 1011, the court said: 'There was evidence, to be sure, tending to show that the defendant had discharged the duty of care which the law imposed upon it. But the current escaped. Whether the tie wire broke without defendant's fault, or whether it broke through insufficiency in size and strength, through lack of guying, or through other causes for which the defendant was chargeable, was an open question, too plainly for the jury to merit discussion. Our attention is not called to a single case, within the range of the maxim (res ipsa loquitur), in which the proof was such that a defendant's verdict was directed. Indeed, Chief Justice MARSHALL says in the *Glowacki* case, above cited, that no such case is to

be found in the books.' (See also *Orr v. Des Moines Elec. Light Co.,* 213 Ia. 127, 238 N. W. 604; *Fox v. Keystone Tel. Co.,* 326 Pa. 420, 192 Atl. 116; *Peterson v. Minnesota Power & Light Co.,* 207 Minn. 387, 291 N. W. 705; *Mares v. New Mexico Public Service Co.,* 42 N. M. 473, 82 P. (2d) 257.)''

 Plaintiff, having made out a *prima facie* case under the *res ipsa loquitur* doctrine, the defendants introduced evidence to show that in the management of the street car on which plaintiff was riding, they did all that human care, vigilance and foresight could reasonably do under the circumstances, in view of the character and mode of conveyance, reasonably to guard against accidents and consequential injuries. Defendants urged that the trial court erred in its rulings upon evidence sought to be introduced by them. One of their expert witnesses, Mr. McMahon, testified in detail about the mechanics of the street car and its electrical apparatus and wiring. He was asked the following question by the attorney for defendant: ''Would a person sitting on a rattan or a cane seat which has a metal base that is attached to a wooden floor, nowhere in contact with any electric wires, is it possible for a man to get an electric shock seated on that seat?'' A general objection to this question by plaintiff's attorney was sustained. Plaintiff had testified that he had sustained a shock. Apparently, the court sustained the objection on the theory that the answer would invade the province of the jury. The ultimate fact to be decided by the jury was whether or not the defendants were guilty of negligence. This question sought an answer on an evidentiary fact upon which the ultimate fact to be found by the jury would be based. The answer sought was one not within the common knowledge of the layman. It was peculiarly within the knowledge of a person with special skill or training. The witness was familiar with the street car and testified from his personal knowledge. When

an expert witness has personal knowledge or has personal observation and his opinion is sought, a hypothetical presentation is unnecessary, but he may be examined as an expert upon direct interrogation. 82 A. L. R. 1338; Jones on Evidence, (2d) Sec. 1333; 20 Am. Jur. 665–666; 32 C. J. S. 346; *Metz v. Yellow Cab Co.*, 248 Ill. App. 609–618. The attorney for the defendants also asked the following question: "Mr. McMahon, if several other people were sitting on the same kind of a cane seat and received no charge of electricity, would you say that those seats were charged with electricity, even if one man—" The court did not permit him to finish the question and did not allow the witness to answer. Neither of the two witnesses for plaintiff who were in the street car claimed to have suffered electric shocks. No other passenger testified to having had a shock. We are of the opinion that the defendants have the right to go into the question of the probability of the plaintiff not having been shocked if no other passengers were shocked. One of these passengers sat on the seat directly over which the fuse box was located. The attorney for defendants had the right to argue that to the jury and had the right to the benefit of any relevant testimony that the expert witness might have given upon the subject. Mr. McMahon was employed by the Board of Supervising Engineers. It is an independent board and sets all standards and approves specifications. A general objection was sustained to the following question propounded to Mr. McMahon: "Did the board approve a fuse box on a 5200 street car?" This witness testified that wooden conduits were used to protect the wires and anybody who might be riding in the car. An objection was also sustained to the following question: "Is that approved by the Fire Department?" The purpose of these questions was to show that the equipment had received the approval of responsible public bodies in the City of

Chicago. The explosion and fire occurred when a northbound automobile driven by Biondi struck the street car, damaging the fuse box. The defendants were endeavoring to show that the equipment provided by them had become standardized. One way of showing this was by showing its approval by responsible public or quasi public bodies in the City of Chicago. It was relevant and competent to show that the fuse box had been approved by the Board of Supervising Engineers and that the conduits had been approved by the Fire Department. We find that the action of the trial judge in sustaining the objections to the questions propounded to Mr. McMahon was erroneous.

Defendants complain of a refusal by the court to give the following instruction:

"The plaintiff does not make out a case against the defendant by proving the happening of the accident and an injury; before the plaintiff can recover he must prove by a preponderance of the evidence not only that he was in the exercise of due care for his own safety, but must also prove by a preponderance of the evidence that the said defendants were guilty of the negligence charged in the complaint and that such negligence, if any, caused or contributed to the injury."

We are of the opinion that the refusal to give this instruction was not error. Other instructions informed the jury that the burden was on the plaintiff to prove his case by a preponderance of the evidence. This instruction, under the record before us, might confuse the jury.

Defendants argue that the judgment is against the manifest weight of the evidence. We agree with defendants that it is a strange circumstance that out of all the passengers that plaintiff was the only one who claimed that he received an electric shock. Charles

Cebates, who was sitting directly over the fuse box, testified that he did not receive a shock. There was no corroboration of plaintiff's testimony about his clothes being burned. Defendants' experts testified as to the design of the street car. The following items of their testimony stand out: 1. There are no exposed wires in the car. All wires going through the interior of the car are in wooden conduits. Wood is not a conductor of electricity. 2. The floor of the car is of wood and there are no electrical connections near in close contact with the seats. 3. The accident happened in July. From April to October the fuses to the heaters are taken out, and when they are taken out, "it kills them." They are attached to the grounds and are dead. 4. The fuse box is an approved one. The insulated cable leading to it is approved by the American Electric Railway Association. 5. The seats are approved, standard seats. They are of rattan and are attached to the wooden floor by means of a pedestal. 6. Once a fuse breaks, the circuit is broken and is "dead right there."

Plaintiff's attorney, in cross-examining one of defendants' expert witnesses, McMahon, brought out the information that in the newer type of street cars such as are operated on Madison street, a new type of fuse box is placed underneath the car. Vehicles scraping along or sideswiping a car with that type of fuse box, would not touch the fuse box. It does not follow that because one type of fuse box is not dangerous that any other type must be dangerous. In this cross-examination plaintiff's attorney also brought out that there is an improved insulation known as "B.X.". The witness testified that "B.X. insulation has the same possibility of fire as any other." There was no testimony that "B.X." insulation was used on any Chicago street cars or on street cars in any other cities. No expert testimony was offered by plaintiff. A study of the record convinces us that the judgment **is against the manifest weight of the evidence.**

For the reasons stated, the judgment of the superior court of Cook county is reversed and the cause is remanded with directions for further proceedings not inconsistent with these views.

*Judgment reversed and cause remanded with directions.*

LEWE, P.J., and KILEY, J., concur.