Roman J. May, Plaintiff-Appellant, v. Columbian Rope Company, Defendant-Appellee.

**Gen. No. 48,548.**

First District, Second Division.

March 14, 1963.

266

Joseph Barbera, of Chicago (John W. Schelthoff and Charles D. Snewind, of counsel), for appellant.

Berchem, Schwantes & Thuma, of Chicago (Michael J. Thuma and Richard Owen Young, of counsel), for appellee.

MR. JUSTICE FRIEND delivered the opinion of the court.

Plaintiff brought suit against Columbian Rope Company, and Leonard and Maude E. Dietz, doing business as Dietz Industrial Company, for personal injuries alleged to have been sustained by him when a rope, manufactured by Columbian and sold by Dietz, broke while being used to move a wooden beam in a building under construction in Morton Grove, Illinois. At the close of plaintiff's case the court allowed the motion of the Dietzes for a directed verdict in their favor, and the jury found them not guilty. At the conclusion of the trial the jury found Columbian guilty and assessed plaintiff's damages in the sum of $45,000. Subsequently defendant's motion for judgment notwithstanding the verdict was allowed. The court also granted defendant's motion for a new trial, the order being conditioned upon subsequent reversal of the judgment notwithstanding the verdict.

The accident occurred on June 26, 1953 at about nine o'clock in the morning. Plaintiff and other workmen employed by the contractor Chappel were engaged in fastening corrugated metal sheets over a row shaped framework. A portable scaffold was used in this process. As plaintiff and the others were moving this scaffold and its related beams to another position, a rope attached to one of these beams broke, causing plaintiff to fall to the ground.

The rope which broke is a one-half inch, three strand Manila line, manufactured by defendant. Plaintiff's amended complaint alleges in substance that defendant manufactured the rope for sale for use in construction work; that it was defendant's duty to exercise reasonable care in the manufacture, inspection, and delivery of the rope so that it was of serviceable quality and not defective or otherwise dan-

gerous or unreasonably prone to break in the course of its normal and intended use; and that notwithstanding said duty defendant negligently manufactured the rope in question, as a proximate result of which plaintiff was injured when the rope broke. No issue is raised as to the sufficiency of the pleadings.

Plaintiff produced evidence that defendant recommended this type of rope for use as elevator rope, hoist rope, safety rope, general purpose rope, and as suitable for industrial use. Defendant adduced extensive proof as to its manufacturing processes, arguing from this evidence that the testing and safety procedures employed showed it to be in the exercise of all due care in the manufacture of its product.

Plaintiff offered no evidence of a manufacturing defect in the rope. His case is entirely circumstantial. He testified that the rope was "brand new," having been placed in use on the morning of the accident. He denies that the truss from which the rope was suspended was sharp, or likely to have cut the rope and caused his fall. He stated, without contradiction, that the rope broke while lifting a weight of seventy-five or one hundred pounds, although its advertised breaking strength was twenty-six hundred fifty pounds. His counsel then argued to the jury, as he does here, that negligence in the manufacture of the rope might be inferred from the fact that when "brand new" it broke while holding less than one twenty-fifth of its rated capacity.

Plaintiff's testimony as to the age of the rope was corroborated by his fellow workman, Dale Waterloo, whose deposition, read into evidence, stated variously that:

> "[it was] fairly new rope. I don't believe they brought any new rope on the job before the accident.

269

". . . .

"We got some new rope on the morning of the accident. I am sure that the rope that broke was the rope that came that morning. . . . ."

In all fairness to this deponent, it should be stated that he freely admitted that an illness had left him with an impaired memory and capacity for narration, and that he was "hazy" about events which happened so long ago.

■■ Although plaintiff's case rests on circumstantial evidence, defendant's argument in support of the judgment notwithstanding the verdict correctly assumes that it is based upon that kind of circumstantial evidence which is embraced within the doctrine of res ipsa loquitur. In Cobb v. Marshall Field & Co., 22 Ill App2d 143, 155, 159 NE2d 520 (1959), the court said:

"In a res ipsa loquitur case there is an inference of negligence arising from *circumstantial evidence*. Although this is often called a 'presumption' it is in reality a presumption of fact and not of law. Such an inference, or presumption, does not disappear when contrary evidence appears; it remains to be considered with all the other evidence in the case and must be weighed by the jury. Prosser, 20 Minn L Rev 214; Feldman v. Chicago Rys. Co., 289 Ill 25. . . ." (Emphasis added.)

We regard the above quotation as correctly expressing the rule that res ipsa loquitur presents one aspect of circumstantial evidence, and that the two terms are not mutually exclusive. By arguing from his evidence that the breaking of the rope "speaks for itself," i. e., is evidence of defendant's negligence, plaintiff brings his case well within the doctrine of res ipsa loquitur and all the rules of law which apply thereto.

A contrary conclusion would require that nomenclature be exalted at the expense of substance.

 Defendant cites authority to support its contention that it is entitled to judgment as a matter of law because, under the res ipsa loquitur inference, plaintiff failed to show that defendant, and not plaintiff, was in control of the harmful instrumentality at the time of the injury. Decisions from other states and recent cases here reject this inflexible application of a rule of control and hold that a defendant in a res ipsa loquitur case cannot automatically defeat an allegation of negligence with a bare showing that, before harm struck, it had parted with control of the harmful instrumentality. (Prosser, Torts 206 (2d ed 1955).)

The demonstrable trend of these authorities is to determine from the nature of the defective instrumentality and the surrounding circumstances whether the inference of the defendant's negligence is strong enough to survive the fact that, between the defendant's control and the plaintiff's injury, another possession intervened. If a reasonable inference of negligence does survive, liability has been imposed.

Thus, Roper v. Dad's Root Beer Co., 336 Ill App 91, 82 NE2d 815 (1948), indicates that, on a sufficient showing, liability for the explosion of a bottle in the plaintiff's possession and control might be traced to the defendant bottler, since it was in control of the bottle at the time of the alleged negligence. Duval v. Coca-Cola Bottling Co. of Chicago, 329 Ill App 290, 68 NE2d 479 (1946), was an action for personal injuries in which the plaintiff claimed to have observed a dead mouse upon drinking Coca-Cola bottled by the defendant, from which he became ill. Defendant argued that its motion for judgment notwithstanding the verdict should have been granted because it was shown not to have been in possession or control of

271

the Coca-Cola bottle at the time of the plaintiff's injury. The court applied the doctrine of res ipsa loquitur and affirmed the verdict and judgment, answering defendant's loss of control argument by saying (p 293): "We cannot take seriously any suggestion that the mouse may have entered or been placed in the bottle while in the garage of the salesman." More recently, in Harris v. Coca-Cola Bottling Co. of Chicago, 35 Ill App2d 406, 183 NE2d 56 (1962), a consumer was permitted recovery against the bottler of a beverage containing a mouse, on facts similar to those of the Duval case. Again, in Johnson v. Stevens Bldg. Catering Co., 323 Ill App 212, 55 NE2d 550 (1944), res ipsa loquitur was successfully invoked when a teapot broke apart in plaintiff's hands after it was passed to her by defendant's waitress. The court reasoned that the inference of defendant's negligence in preparing the pot of tea survived the intervening "momentary possession" of the plaintiff.

On the other hand, if the intervening possession and control (whether that of the plaintiff or another) is of a kind which "spoils" the inference of defendant's negligence, res ipsa loquitur inferences may not be indulged by the plaintiff. In Miszczak v. Maytag Chicago Co., 11 Ill App2d 496, 138 NE2d 52 (1956), plaintiff was injured when the tension release bar of her washing machine failed to operate. The stipulated facts showed that the machine had operated perfectly for a two-year period prior to the accident. The court concluded that this intervening period of trouble-free use destroyed any inference of negligence in the manufacture of the machine. Similarly, Brooks v. Hill-Shaw Co., 117 F2d 682 (7th Cir 1941), held that res ipsa loquitur did not apply to the explosion of a coffee maker manufactured by defendant, plaintiff admitting that she had used the coffee maker two or three hundred times before the accident, with no difficulty. The court held that this admitted evidence of intervening

safe use rendered unreasonable any inference that the coffee maker was defective when it left defendant's assembly line.

In line with the thrust of the above cases, we conclude that the admitted intervening possession of plaintiff (and of the retailer to whom defendant sold the rope) does not, on the facts before us, render unreasonable plaintiff's inference that the rope was negligently manufactured, given his evidence as to its newness and the circumstances of its breaking.

█ Defendant asserts that plaintiff has not disproved the possibility that the rope was weakened by a mistaken cut while being shortened into usable lengths. However, there is no evidence to suggest that this happened. Moreover, plaintiff is not required to disprove every alternative hypothesis suggesting a cause other than negligence in order to recover. Foster v. Union Starch & Refining Co., 11 Ill App2d 346, 353, 137 NE2d 499 (1956); Heimsoth v. Falstaff Brewing Corp., 1 Ill App2d 28, 31, 116 NE2d 193 (1953).

█ Defendant next asserts that we must uphold the judgment in its favor because "reasonable men" could not infer from the evidence that plaintiff's fall was due to any negligence on defendant's part. Counsel argues from the testimony of defendant's expert witnesses and the appearance of the broken rope that (1) the rope was not new at the time of the accident, as plaintiff and his witness claimed, being instead dirty, worn, and frayed at the time of plaintiff's fall; (2) the rope did not "break" but was severed on the sharp edges of the steel beam against which it rested. As will be seen from our discussion of defendant's motion for a new trial, there is considerable merit to this characterization of plaintiff's evidence. However, defendant misconstrues our function in ruling on the propriety of judgment notwithstanding the verdict by suggesting that we may hold a res ipsa loquitur inference to be inadequate as a matter of law, because

as a matter of fact we disbelieve the "root facts" (for example the alleged newness of the rope) which are the foundation upon which that inference rests.

It is well settled that on appeal from judgment notwithstanding the verdict we are concerned only with the narrow question whether there is any evidence, in its aspect most favorable to plaintiff, together with all reasonable inferences to be drawn therefrom, which would tend to prove the material elements of plaintiff's case. In so doing we may not consider the credibility of the testimony or test the preponderance of the evidence. Proof unfavorable to the plaintiff cannot be considered. The above rules apply, "even though upon the entire record the evidence may preponderate against the party in opposition to such motion [for judgment notwithstanding the verdict], so that a verdict in his favor could not stand when tested by a motion for a new trial." Merlo v. Public Service Co., 381 Ill 300, 311–312, 45 NE2d 665 (1942).

With the foregoing rules in mind, it is clear that in reviewing the propriety of judgment notwithstanding the verdict we cannot cast into question the truth of plaintiff's testimony or that of his corroborating deponent concerning the age of the rope or the condition of the truss from which it hung. These were pre-eminently questions of fact for the jury's determination. Any ruling to the effect that res ipsa loquitur does not apply which is based on doubt as to these questions would clearly violate the rules which govern the granting of judgment notwithstanding the verdict and would constitute an indirect invasion of the jury's province. As was said in a case closely analogous to our own on this point, "whether or not the foregoing testimony was true was a question of fact for the jury. . . . . . If such evidence was true, then, in our opinion, the doctrine of res ipsa loquitur is applicable." O'Hara v. Central Illinois Light Co.,

319 Ill App 336, 341, 49 NE2d 274 (1943). In the case before us, it was not only for the jury to determine whether the facts as stated in plaintiff's testimony were true; it was for their further determination whether the permissive inference of negligence arising from those facts was to prevail over defendant's countervailing proof of due care. Cobb v. Marshall Field & Co., 22 Ill App2d 143, 158, 159 NE2d 520 (1959).

■■■ Our holding that plaintiff's case based on the doctrine of res ipsa loquitur was sufficient to resist judgment notwithstanding the verdict disposes of defendant's contention that plaintiff must prove specific negligence. The accident itself, together with its attendant circumstances, affords reasonable evidence that it arose from want of proper care on defendant's part. Feldman v. Chicago Rys. Co., 289 Ill 25, 34, 124 NE 334 (1919).

■■ ■■ Defendant correctly objects to plaintiff's belated efforts to add breach of warranty as a separate and an independent basis for his claim. This contention is made for the first time on review. Furthermore, defendant's point is academic since we hold that plaintiff's negligence theory was sufficient to resist judgment notwithstanding the verdict. Moreover, defendant concedes, relevantly, that in a negligence action the defendant's representations as to the uses of its product may be introduced as having a bearing upon the standard of care the defendant should be required to meet.

■■■ Our holding that the entry of judgment notwithstanding the verdict was improper makes necessary a consideration of the trial court's action in granting defendant's alternative motion for a new trial. Plaintiff asserts that the trial court abused its discretion in granting this motion, and says the verdict should be reinstated. In making this claim, plaintiff states that it "seems certain" that the court granted

the motion for a new trial because it was of the opinion that the verdict was against the manifest weight of the evidence. We are in accord with this theory.

Although no special interrogatories were tendered to the jury as to the age of the rope, their verdict in favor of plaintiff is an implied finding that the rope was new, since this was central to plaintiff's inferential proof of negligence.

The rope which caused plaintiff's fall is before us as an exhibit, as it was before the jury. It was in possession of counsel until the trial. Plaintiff says that the "broken" end of the rope was unwound on the witness stand so that the tape marker identifying the rope as defendant's (inserted in the rope as a matter of industry custom) could be shown to the jury. Beyond this neither party argues that the rope has been subjected to interim treatment which would alter its basic appearance since the time of plaintiff's fall.

An examination of the rope casts grave doubt on plaintiff's statements that the rope was new at the time of the accident. Describing it in lay terms, we would characterize it as a worn, dirty, limp old rope, dark on its inside strands as well as on the outer surface. One end of the rope is wrapped with wire to prevent unraveling of the three strands, and the "broken" end, when its separated strands are drawn together, has the appearance of having been rather sharply cut. In the interest of greater precision, however, we quote the description of the rope which was given by defendant's expert witness Starr, in explanation of his opinion that the rope was not new:

> "The rope is uniformly discolored over its entire length and only rope which has been used for long periods of time could be so uniformly discolored. Secondly, I believe because of the shape of the strands of rope, that this rope was subject to

considerable loads at one time or another, and has been rubbed over objects as the rope is flat, whereas a new rope is rounded and these strands are still in their rounded condition. It would take much wear and strain and rubbing over other things to flatten the surface strands of this rope the way it is. Thirdly, the fibers of this rope are broken continuously along the surface between the edges of the strands. There are many such ends throughout the whole length of the rope. If the yarn is opened up, many of these fibers will drop out. This would not be true of a new rope. Based upon these reasons, I believe that the rope is not a new rope."

To appreciate the full impact of plaintiff's claim that the above described rope was "brand new" at the time of his fall, it should be noted that plaintiff testified to the following state of facts:

(1) the rope, "brand new," was brought to the job site at eight forty-five or nine on the morning of the accident; and

(2) the rope broke at nine-fifteen or nine-thirty of this same morning while plaintiff and others were moving a scaffolding and its related beams and paraphernalia.

Thus, according to plaintiff's unequivocal testimony, the rope before us was reduced from "brand new" to its condition as described by Starr after a total of only forty-five minutes' use. This conclusion staggers one's sense of reality.

Nothing we have said is meant to imply that there was no new rope on the job site the day of plaintiff's fall. It is uncontroverted that some new rope was brought to the job at nine. It is equally uncontroverted that there was much used rope on the job at the time of plaintiff's fall. Nevertheless, plaintiff and his

deponent Waterloo were plaintiff's only witnesses to suggest that plaintiff's rope was new that morning. Indeed, plaintiff's witness Stroup, who brought the new rope to the job that morning, could say only of plaintiff's rope: "All I can remember about the rope was that it was ½ inch line dirty as if it had been used. Of course after a rope is used for any length of time there is dirt on it. It just looked like a broken piece of line. I think it was pretty new."

Plaintiff seeks to explain away the uniformly dirty appearance of the rope by showing that while in use it was handled by workmen with dark colored mastic on their hands. As defendant's witness Starr pointed out, this explanation is not convincing, since it is unlikely that such brief handling would produce such uniform and thoroughgoing discoloration. More important, however, is the fact that "dirty hands" afford no explanation for the rope's worn and frayed appearance.

Defendant's witness Starr expressed his opinion that the even break in plaintiff's rope had been caused by a sharp object. He based this conclusion on his experience in observing that when a three strand rope breaks, the three strands break one at a time at different points along the length of the rope to produce an uneven break. Defendant produced specimen one-half inch Manila ropes, broken on a testing machine, which tend to substantiate Starr's testimony. Moreover, plaintiff's witness Stroup testified that after visiting plaintiff in the hospital he went to the job site and examined the needle beam from which plaintiff's rope had hung, finding the edges of this beam to be sharp. This, too, was contradicted by plaintiff, who testified that these edges were not sharp, having deposed earlier that they were not "too sharp."

Plaintiff urges that the granting of a new trial was an abuse of the trial court's discretion, because arrayed against the "opinion and conjecture" of de-

fendant's witness Starr is the "positive testimony" of both plaintiff and witness Foster (meaning, apparently, witness Stroup) who, he says, testified "to having bought the rope no more than a day or two prior to the accident." Witness Stroup did not so testify; he testified to having bought a rope before the accident, and said he brought it to the job on the day of the accident. As previously indicated, however, he said of plaintiff's rope that "it was dirty as if it had been used." Witness Foster did not testify as to the rope or the accident at all, according to plaintiff's abstract of record. He described himself as secretary-treasurer of plaintiff's former employer, and testified as to plaintiff's wages.

Arrayed against the bare assertions of plaintiff and his deponent are the reasoned testimony of defendant's expert Starr, the testimony of plaintiff's witness Stroup, and above all the rope itself. But of course, in determining whether the trial court abused its discretion in granting defendant's motion, we must do more than simply "count noses"; our law has progressed beyond the days of the oath helper and the compurgator. In determining where the manifest weight of the testimony lies, we can (and in this case must) examine the reasonableness of the testimony offered. Viewing it in this light, we cannot say that the trial court abused its discretion ordering a new trial.

For the reasons herein expressed, the order of the trial court granting judgment in favor of defendant notwithstanding the verdict is reversed, and the order granting a new trial is affirmed.

Order granting judgment in favor of defendant reversed; order allowing defendant's motion for new trial affirmed.

BRYANT, P. J. and BURKE, J., concur.