Decatur and Macon County Hospital Association, a Corporation Not For Profit of Illinois, for the Use of Niagara Fire Insurance Company, Phoenix Assurance Company, Standard Fire Insurance Company, Rochester American Insurance Company, American Insurance Company, United States Fire Insurance Company, Hartford Fire Insurance Company, and Merchants Fire Assurance Corporation, Plaintiff-Appellee, v. Erie City Iron Works, a Foreign Corporation, T. A. Brinkoetter & Sons, Inc., a Foreign Corporation, and Illinois Power Company, an Illinois Corporation, Defendants, Erie City Iron Works, a Foreign Corporation, Defendant-Appellant.

Gen. No. 10,679.

Fourth District.

September 26, 1966.

Rehearing denied October 24, 1966.

Earl S. Hodges, of Springfield, and Greanias & Owen, of Decatur (Marshall A. Susler, of counsel), for appellant.

Giffin, Winning, Lindner & Newkirk, of Springfield (James M. Drake, of counsel), for appellee.

TRAPP, P. J.

Defendant Erie City Iron Works, hereinafter designated Erie, appeals from a judgment in the sum of $30,818.50 entered in favor of the plaintiff upon the verdict of a jury against Erie and T. A. Brinkoetter & Sons, Inc. Other disposition has been made as to the case against the latter and we consider only the appeal of Erie.

Plaintiff's action was for property damage in the approximate amount of the judgment incurred as the result of the explosion of a gas-fired boiler manufactured by Erie and installed by Brinkoetter. At the time of the explosion installation had just been completed and was at the stage of the initial start-up and adjustment of the boiler. Title to it had not yet passed to the plaintiff.

The defendant's theory is that defendant was not guilty of the negligence that was the proximate cause of plaintiff's damages; that the court should have directed a verdict in favor of this defendant, or granted defendant's post-trial motion for judgment notwithstanding the verdict of the jury or, in the alternative, should have granted defendant a new trial of the issues, because of error committed by the court in submitting, to the jury, both Count I and Count II of plaintiff's complaint, which respectively were predicated upon a res ipsa loquitur theory and specific negligence theory; that there was error by the court in denying defendant's motion for mistrial because of prejudicial conduct of counsel; that conduct of

146

a juror was prejudicial to defendant; and that there was error by the court in giving certain instructions to the jury; and other errors hereinafter discussed.

Plaintiff purchased the boiler as a "package" boiler fabricated by Erie at its plant and shipped assembled for installation as a complete unit with automatic firing controls built on.

The fire control unit and the main motorized valve were not manufactured by Erie but were purchased by it and affixed to the fabricated boiler. The Brinkoetter contract called for it to install the boiler and connect it to the line bringing gas into the building.

In making the installation, Brinkoetter did not install what has been called a "dirt leg," i. e., a trap consisting of a length of pipe extending beyond the point where a vertical gas line is turned so that it travels horizontally. Its function is to catch condensed moisture and debris in the gas line. Plaintiff had retained consulting engineers to design and supervise installation of the boiler. The schematic drawing provided by the engineer did not show a "dirt leg." The latter testified that the contractor should install a "dirt leg" whether drawn in the plans or not. Officers of Brinkoetter say that it puts in dirt legs when the plans call for them, otherwise it does not.

Neither the fabricated boiler nor the connecting line, as installed, included a "strainer," which is described as a distinctive appearing section of pipe containing a screen, the function of which is to catch debris which might be carried through the line by the flow of gas. When used, it is installed in the line ahead of the valves and controls. A brochure of the valve manufacturer recommended that a strainer be placed ahead of the main valve. Such a strainer was not included in the unit fabricated by Erie. The consulting engineer's schematic drawing did not include a strainer. He testified that he would have included it if he had known that a strainer was recommended. An officer of Brinkoetter testified that he had never heard

147

of a strainer in a gas line. In behalf of the latter, its foreman and employes testified that as the gas line was being installed, steps were taken to knock loose the scale and clean the connecting pipe. It appears that the installation was nearly completed when the contractor was advised by the gas company foreman that it would be necessary to install a regulator, i. e., a device which lowered the pressure from the 35-pound pressure in the main to some 10 pounds as specified by the boiler. A used regulator was available at the hospital and was installed. At first it did not function, but after some adjustment was observed to be reducing the pressure. It was not tested after the explosion. In installing the regulator at this time, it was necessary to cut the gas line with a torch and weld on a section of pipe. It does not appear what, if anything, was done to inspect for and remove debris in the pipe following this operation. There is some conflict in the evidence as to whether or not welding slag would enter the pipe by reason of this work.

Under the terms of its contract with Erie, plaintiff elected to have the services of a start-up engineer. Upon notification of the completion of the installation such engineer, one Enders, was sent by Erie. The explosion in issue occurred at 11:40 a. m. on Thursday, September 25, 1958. In summary, it appears that Enders had arrived on the preceding Tuesday, that the boiler was started up and fired for some 20 hours and then shut down, and that on the morning of the 25th it had been started up and fired for some 2 hours preceding the explosion. Enders died following the explosion, apparently as the result of injuries sustained.

With regard to the things done during this period, one Binns, a member of the hospital maintenance staff, testified that Enders started the boiler operation, handled the controls and made adjustments, and that immediately prior to the explosion Enders was making an adjustment of the water level in the boiler. Charles Fearn, foreman

148

of the gas distribution crew of the utility company which was working on the exterior gas line, testified that he had been in the boiler room during the morning and Enders had told him that the boiler was on low fire or "no load" firing, and that he was going to test the boiler on high fire, asking Fearn to time the meter outside so that there could be a measurement of the cubic feet of gas entering the boiler on high fire. No specific arrangement was made as to when this would be done.

Following the explosion, a State boiler inspector, and representatives of the interested parties, together with engineers and experts retained by them, assembled at the scene to examine the boiler which had been kept undisturbed. Several of them testified that they had noticed the absence of the dirt leg and the screen in the gas line connected to the boiler. The main valve was examined as to its external indicator and the testimony varies from the statement that it was apparently closed, through slightly open to one-third open. The boiler inspector testified that he assumed that it was open. It does not appear that any organized procedure was followed so that each expert present observed all of the matters testified to.

The main valve was then disassembled. Most witnesses testified to observing some scale and several pieces of welding slag on both the upstream and downstream sides of the valve.

There is testimony that upon examination of the several parts of the valve, a resilient neoprene seal was observed to be indented and that the stainless steel seat of the valve was scored to a depth of $\frac{1}{16}$th of an inch or so, the width of the indentation being that of a blade of a table knife. There is other testimony that the seat bore only normal scratches. It does not appear that tests were made to determine whether the indentations on the neoprene seal coincided with the scoring of the valve seat. At the trial the neoprene seal no longer bore any indenta-

149

tion. This was explained as being due to the resilient nature of the substance. The steel valve seat was not produced at the trial.

The consensus of the testimony is that there was a gas explosion followed by an explosion of the boiler itself. The opinion testimony is that the first explosion resulted from the ignition of a surplus of gas within the combustion chamber, which gas was somehow ignited. Paul Wilson, an employe of Erie in charge of their service department, testified that he did not believe it possible to find the actual cause of the majority of explosion cases, and George Harper, a professor of engineering at the University of Illinois, testified that in such an explosion things are so disrupted that it cannot be ascertained with certainty what happened, but that it was necessary to draw deductions.

From the record it appears that a variety of factors inducing the explosion may have existed. There is, of course, the contradictory nature of the testimony as to whether or not the motorized main valve was closed or open, whether or not slag from welding had lodged in the main valve so that it was not completely closed, and whether such slag would be sufficient to hold the valve open with the pressures concerned without distorting the valve stem, which apparently was in normal condition.

There is testimony by Ted Brinkoetter that the control system, upon being tested, did not always work, but there is also testimony that it functioned correctly upon tests. Harry Reynolds, an investigating engineer retained by the plaintiff, testified that it would take a very small amount of gas to cause an explosion in this boiler, and that it was particularly hazardous to operate the boiler on a "no load" basis as the mixture of air and gas gets out of balance and becomes explosive. He also testified that upon initial examination, the oil burning switch was on instead of the gas burning switch. A witness, testifying in behalf of Brinkoetter, stated that shortly before the explosion,

150

Enders flipped a switch and that the flame in the boiler went out and did not come on again.

It is one of defendant's arguments that by this contract it was to furnish a package boiler but had no responsibility for its installation. This position was taken in its first motion to the complaint and is argued here.

The nature of defendant's disclaimer seems to be based upon its Exhibit #1 contained in a foreword to the instruction manual which Erie shipped with the boiler. A relevant part includes the following:

> "When the service of an Erie City Iron Works Engineer is provided for the customer, it is for the purpose of aiding in the training of the customer's personnel and not to replace them or assume any of their duties. It should be understood that the responsibility for operation rests solely with the customer's operators and the Erie City Iron Works assumes no responsibility for the customer's operators' failure to properly perform their respective duties, and the presence of an Erie City Iron Works Engineer at the customer's plant in no way relieves the customer's personnel of any of their responsibilities."

The following also appears in slightly varying form in several places in the contract for the purchase of the boiler:

> "With respect to all preliminary operations, initial start-up, demonstration of capacity and performance guarantees, representatives of the Company are authorized only to advise and consult with the Purchaser or its representatives and no representative of the Company is licensed to operate the equipment. In the event the Purchaser shall operate the equipment specified hereunder prior to final acceptance, the Purchaser shall indemnify and save harmless the Company against any loss or expense and against any liability imposed upon the Company, resulting

151

from the operation of such equipment by the Purchaser prior to final acceptance, *except any such loss, expense or liability for injury or damage resulting from the negligent acts or omissions of the Company or its agents or employees.*" (Emphasis supplied).

It appears from the testimony that the package boiler is not operational upon delivery but requires adjustment to make it perform properly. Paul Wilson, who is in charge of field service for defendant, testified that the linkage of the butterfly valve regulating the ratio of air and gas must be adjusted and that the damper linkage must be "positioned." He testified that the service engineer never operates the boiler but that it is the obligation of the purchaser to make such adjustments according to the engineer's instructions. He testified that it was the service engineer's duty to make a visual check of the gas line installed, check the controls and firing equipment, consult and assist placing the boiler in service, instruct in operating the boiler and its controls and assist in making the final adjustments.

Brewster, a witness for Brinkoetter, testified that Enders examined the pipeline but made no suggestions for changes in the work as installed, and the record is that Enders did, in fact, start-up and fire the boiler, make adjustments, and made or had arranged to make the tests, including the testing of its capacity on the high fire. Binns, an employe of the hospital, testified that no one other than Enders handled or adjusted the controls. The manual submitted by Erie contains a section A designated "Preparing the boiler for service—Inspection of unit." Section A–1 states that prior to placing equipment in service a complete inspection should be made to determine its condition and continues:

"In case of newly constructed power equipment, this inspection should insure that the unit has been correctly completed."

Section A–2 is as follows:

"Responsibility for the completion of construction normally rests with the customer's construction engineer working in conjunction with the manufacturer's erection or service engineer. At completion of construction work, an inspection should be made in the presence of the customer's construction engineer, operating engineer, the construction superintendent and the manufacturer's engineer (if one is present) and agreement reached that the equipment is in a satisfactory condition for placing into service."

There is no evidence that such inspection or agreement was reached or called for by defendant's service engineer.

As to the contention that by contract Erie had no responsibility, claimed under its Exhibit #1, the "foreword" to the instruction manual and the several provisions set out in the contract should not control under these circumstances. The effect of these documents might be that Erie could not be required to perform the tests and effect the start-up of the boiler, but they should not control liability where under the evidence it might be reasonable to conclude that they did, in fact, undertake and perform the work. The contract provision quoted does not attempt to exclude negligence of Erie employes.

Erie discusses Count I of the complaint as involving the principles of res ipsa loquitur under a pleading of general negligence. These principles are thoroughly discussed in Metz v. Central Illinois Electric & Gas Co., 32 Ill2d 446, 207 NE2d 305, and need not be reiterated.

■ Erie urges that the inference of negligence under Count I should not be allowed because the boiler was not under its exclusive control. The defendant points out that the evidence discloses that Enders, Brewster, an employe of Brinkoetter, Binns, an employe of the hospital, and Robert Brinkoetter were all present at the time of the explosion. The evidence has been examined to determine

153

what, if anything, these individuals were doing to exercise control of the unit. We cannot say that it is contrary to the manifest weight of the evidence for the jury to conclude that Erie's man Enders was, in fact, in control of the proceedings incident to the start-up and testing of the boiler. There is no evidence that any person other than Enders participated in any phase of the work.

In May v. Columbian Rope Co., 40 Ill App2d 264, 189 NE2d 394, the complaint alleged the purchase and delivery of a new rope which broke shortly after placing the rope into use. There was judgment n. o. v. entered by the trial court. The Appellate Court reversed, holding that the inference of negligence under the theory of res ipsa loquitur was properly applicable. As to that defendant's contention that it was not in control of the rope at the time of the injury, the court said:

> "Decisions from other states and recent cases here reject this inflexible application of a rule of control and hold that a defendant in a res ipsa loquitur case cannot automatically defeat an allegation of negligence with a bare showing that, before harm struck, it had parted with control of the harmful instrumentality. (Prosser, Torts 206 (2d ed 1955).)
>
> "The demonstrable trend of these authorities is to determine from the nature of the defective instrumentality and the surrounding circumstances whether the inference of the defendant's negligence is strong enough to survive the fact that, between the defendant's control and the plaintiff's injury, another possession intervened."

The court continued to say that it was for the determination of the jury as to whether the permissive inference of negligence arising from the facts was to prevail over defendant's countervailing proof of due care.

As stated in Prosser, Law of Torts, 2d ed 1955, p 206, chap 7, § 42, the word "control" may be the wrong word. It is said:

154

"Some courts have said that it is enough that the defendant was in exclusive control at the time of the indicated negligence. It would be far better, and much confusion would be avoided, if the idea of 'control' were discarded altogether, and we were to say merely that the apparent cause of the accident must be such that the defendant would be responsible for any negligence connected with it."

In Schroeder v. City & County Sav. Bank of Albany, 293 NY 370, 57 NE2d 57, the defendants were several contractors and the owner of a building under repair. The court noted:

"It is not necessary for the applicability of the res ipsa loquitur doctrine that there be but a single person in control of that which caused the damage."

Amongst other cases defendant relies upon Kirchner v. Kuhlman, 334 Ill App 339, 79 NE2d 628. There defendant's employes were working on plaintiff's premises but we find no evidence that these defendants had control of the trash container belonging to the plaintiff in which the fire started. Again, in Krump v. Highlander Ice Cream Co., 30 Ill App2d 103, 173 NE2d 822, the collision of two automobiles caused one of them to strike and damage plaintiff's building. While the court said that the doctrine of res ipsa loquitur did not apply, it did hold that there was a presumption of negligence where an accident occurred which would not ordinarily occur if due care had been taken, and that it was proper to call upon the defendants to exculpate themselves. The distinction between this conclusion and the theory of res ipsa loquitur appears slight.

█ Defendant argues that Count I of the complaint alleged general negligence stating a cause of action upon the theory of res ipsa loquitur, while Count II alleges certain acts of specific negligence, and that under the authorities in this State the inference of negligence which

arises under res ipsa loquitur, "vanishes" upon the introduction of evidence of specific negligence. Amongst the authorities cited are Bollenbach v. Bloomenthal, 341 Ill 539, 173 NE 670. This rule has been categorically overruled by our Supreme Court in Metz v. Central Illinois Electric & Gas Co., 32 Ill2d 446, 207 NE2d 305. In that case the complaint charged general negligence in one count employing the theory of res ipsa loquitur, and in a second count alleged specific negligence. At the close of the evidence plaintiff was required to, or did elect, to rely upon the charge of negligence and the theory of res ipsa loquitur. The verdict for the plaintiff was reversed in the Appellate Court on the theory that res ipsa loquitur did not apply as other parties had access to the area of the gas main. In reversing the Appellate Court, the Supreme Court remarked upon the conflict amongst the Illinois decisions. We may note that many of these decisions are in broad language open to a variety of interpretations, and frequently they do not indicate the reason for the decision. In Metz the Supreme Court concluded that the more studied, more just view is that the inference of negligence does not vanish when contrary evidence appears, but that it remains to be considered and weighed by the jury against the direct evidence offered by the party charged, citing Cobb v. Marshall Field & Co., 22 Ill App2d 143, 159 NE2d 520; Illinois Pattern Jury Instruction, 22.01 with comment on pages 128, 129; Prosser, 20 Minn L Rev, 241. See also O'Hara v. Central Illinois Light Co., 319 Ill App 336, 49 NE2d 274; May v. Columbian Rope Co., 40 Ill App2d 264, 189 NE2d 394.

■ Defendant's contention that plaintiff should have been required to elect as between the counts is controlled by the rule of Metz. Defendant's authorities are Wm. Wrigley, Jr. Co. v. Standard Roofing Co., 325 Ill App 210, 59 NE2d 510; and Simmons v. South Shore Hospital, 340 Ill App 153, 91 NE2d 135. In the former case the Appellate Court undertook to specify what may be described

as the requirements that plaintiff elect between the general negligence count and the count for specific negligence. The only cited authority for such procedure was Bollenbach v. Bloomenthal and its rule that the inference of negligence vanished upon the introduction of evidence of specific negligence. By reason of the Metz decision, this reason for such rule no longer exists. Simmons v. South Shore Hospital, as well as Jackson v. 919 Corp., 344 Ill App 519, 101 NE2d 594, simply relied upon the rule of Wrigley as authority without discussing it.

There is, in fact, persuasive opinion contrary to the contention of Erie regarding the theory of election in Erckman v. Northern Illinois Gas Co., 61 Ill App2d 137, 210 NE2d 42. There premises were damaged by an explosion of gas leaking from the company lines. The complaint alleged only specific negligence and there was some evidence of a failure of periodic inspection. The trial court gave an instruction authorizing the jury to apply, or employ, the inference of negligence under res ipsa loquitur. The Appellate Court reversed since there was no pleading of general negligence, but stated that upon a new trial the complaint should be amended to include such an allegation. The court there said:

> "An inference of general negligence arising from the doctrine of res ipsa loquitur is not necessarily inconsistent with proof of specific negligence. To hold that proof of specific negligence precludes the application of the res ipsa doctrine could lead to the absurd result of weak proof of specific negligence voiding a strong inference of general negligence. . . . If there is an inference of general negligence and proof of specific negligence, but reasonable men may differ as to the effect of this evidence, it should then be for a jury to determine under which theory, if any, the plaintiff should prevail. McCormick v. Kopmann, 23 Ill2d 189, 205, 161 NE2d 720 (3rd Dist 1959)."

157

■ The Illinois courts recognize that the doctrine of res ipsa loquitur is but one form of circumstantial evidence. May v. Columbian Rope Co., 40 Ill App2d 264, 189 NE2d 394.

It has been suggested that the doctrine that requires election assumes that the inference arising through res ipsa loquitur must be an alternative to direct proof rather than a type of circumstantial evidence to be weighed with other evidence, and it has been criticised as an assumption that the pleader must be totally ignorant of the facts. 2 ALR3d 1335, at 1340. There is reason in the hypothesis that there should not be a penalty imposed upon the pleader for placing before the court all facts known to him. 27 Fordham L Rev, 411–415; Foster v. Union Starch & Refining Co., 11 Ill App2d 346, 137 NE2d 499. This is particularly true when an allegation notifies the defendant of the intent to rely upon the inference of negligence arising under the doctrine of res ipsa loquitur. It is the policy under the rule of Metz v. Central Illinois Electric & Gas Co., 32 Ill2d 446, 207 NE2d 305, that once the inference of negligence arises through allegations of general negligence, it remains for the consideration of the jury, unless and until the precise cause of the injury is established. 27 Fordham L Rev 411. In Prosser, Law of Torts, 2d ed, chap 7, § 43, p 214, it is suggested:

"It is quite generally agreed that the introduction of evidence which does not purport to furnish a complete explanation of the occurrence does not deprive the plaintiff of res ipsa loquitur."

In Cassady v. Old Colony St. Ry. Co., 184 Mass 156, 68 NE 10, at p 12, the court said:

"The defendant also contends that, even if originally the doctrine would have been applicable, the plaintiff had lost or waived her rights under that doctrine, because, instead of resting her case solely upon it, she undertook to go further, and show par-

ticularly the cause of the accident. This position is not tenable. It is true that, where the evidence shows the precise cause of the accident, (citing authorities), there is, of course, no room for the application of the doctrine of presumption. The real cause being shown, there is no occasion to inquire as to what the presumption would have been as to it if it had not been shown. But if, at the close of the evidence, the cause does not clearly appear, or if there is a dispute as to what it is, then it is open to the plaintiff to argue upon the whole evidence, and the jury are justified in relying upon presumptions, unless they are satisfied that the cause has been shown to be inconsistent with it. An unsuccessful attempt to prove by direct evidence the precise cause does not estop the plaintiff from relying upon the presumptions applicable to it."

We believe that this position was approached in Krueger v. Richardson, 326 Ill App 205, 61 NE2d 399, when the court noted that the plaintiff was not required to prove the specific acts of negligence as alleged, but they had a right to rely upon the proof and its reasonable inferences to establish a prima facie case of general negligence.

In this case it seems proper to say that reasonable men might differ as to the effect of the evidence heard by the jury. Expert witnesses would not even undertake to announce an hypothesis, but rather advised of the virtual impossibility of reaching a specific determination of what caused the explosion. This situation here appears to be precisely that contemplated in the language of Erckman v. Northern Illinois Gas Company.

In its reply brief Erie contends that the doctrine cannot be followed because there are multiple defendants. No Illinois cases seem applicable as precedent. In Schroeder v. City & County Sav. Bank of Albany, 293 NY 370, 57 NE2d 57, it was held error to dismiss a complaint seeking to apply res ipsa loquitur as against three defend-

ants. See also Burr v. Sherwin-Williams Co. (Cal App), 258 P2d 58, 38 ALR2d 905 et seq. Again in Zichler v. St. Louis Public Service Co., 332 Mo 902, 59 SW2d 654, general negligence was pleaded against the service company while specific negligence was pleaded as to another defendant who was found not guilty by the jury. It was contended that it was improper to permit the res ipsa loquitur inference to be applied to one joint tort feasor, but not the other. Pointing out that the rule was one of evidence rather than pleading, the court said:

> "A plaintiff should not be compelled to confine his action to one joint-feasor only in order to be accorded the rights which the law gives to him."

It being the policy under the rule of Metz that the inference of negligence is to be weighed by the jury with other evidence, we see no reason why the benefit of such rule should be denied to the plaintiff where under the events at issue, more than one party may be the source of injury to the plaintiff for otherwise he would be limited in the use of, or be completely denied the benefit of the rule. In Metz the Supreme Court said that whether the doctrine applies in a given case is a question of law for the trial court. We believe that these conclusions dispose of the contentions of Erie that the court erred in refusing to strike par 8 to Count I.

Defendant contends that the case must be remanded for error in the giving of instructions. His objection to plaintiff's instruction #20 is that it permits the jury to consider the case upon the theory of res ipsa loquitur, as well as upon the allegations of specific negligence. The matters hereinabove discussed dispose of this contention.

■ There is objection to Brinkoetter's instruction #6 which may be summarized as an issues instruction relating to negligence alleged as to Erie and as to the defendant Brinkoetter. It is contended that as to Erie there is no evidence in the record as to certain matters

stated in the instruction to be alleged in the complaint. The Abstract discloses that at the conference on instructions Erie simply made the objection that the evidence did not support all of the charges. This does not meet the rule that specific objections to instructions must be made at the conference on instructions. Vasic v. Chicago Transit Authority, 33 Ill App2d 11, 180 NE2d 347. The court's comment indicates that he believed that those matters not supported by the evidence had been omitted from the instruction. Under such circumstances we do not believe that there is reversible error.

■ Erie urges that the cause must be reversed and remanded by reason of the fact that a juror on voir dire indicated that he was not interested in any lawsuits then pending in court, but that subsequent to the trial, counsel discovered that he had been defendant in a lawsuit and was, at the time of trial, a plaintiff in a pending cause. Erie does not contend that it was, in fact, prejudiced by the juror sitting upon the panel, but says that the prejudicial effect cannot be calculated. It indicates that it could have challenged the juror, though it is not claimed that it would have done so. In Department of Public Works & Buildings v. Christensen, 25 Ill2d 273, 184 NE2d 884, it was alleged that the party would not have accepted the juror if a true answer had been given. The Supreme Court there held that the motion for a new trial would be denied unless it was shown not only that the juror answered falsely, but also that prejudice resulted. Erie cites the case of People v. Ortiz, 320 Ill 205, 150 NE 708, which may be distinguished because in that case the juror had actually expressed hostility to the defendant which he had concealed.

■ Erie urges that the judgment must be reversed because of a reference to insurance introduced during cross-examination in behalf of the defendant Brinkoetter. One George Harper testified in behalf of the plaintiff as an expert witness who had examined the boiler following

the explosion. It appears that he had originally been requested to make the examination by a representative of the company insuring Erie. The name of the insurance company was given in answer to a question to whom he had delivered his report. The trial court sustained an objection to a question as to what party was covered and an objection as to whether the insurance company represented Erie. The trial court, while indicating disapproval of counsel's action, denied the motion for a mistrial.

It is clear that plaintiff did not, in any way, precipitate this issue. Under the circumstances of this case, the proceedings clearly indicated to the jury that certain insurance companies were to be the beneficiaries of a judgment for plaintiff. This fact would seem to indicate little probability of prejudice as between insurance companies upon the issue of liability. Edwards v. Hill-Thomas Lime Co., 378 Ill 180, 37 NE2d 801.

Upon the possibility of prejudice regarding the issue of damages, the amount of the verdict is slightly less than the amount paid by plaintiff to Erie for the boiler. Insofar as counsel may have attempted to create prejudice as between the parties defendant, the verdict of the jury is joint and they seem to make no distinction. Under the circumstances of this case, we conclude that there was no abuse of discretion by the trial court in refusing to grant a mistrial. Isenhart v. Seibert, 6 Ill App2d 220, 127 NE2d 469.

Upon consideration of the issues of law, we conclude that the trial court did not err in refusing to direct a verdict or enter a judgment n. o. v. upon the several motions made by Erie, and that, from an examination of the evidence, the verdict of the jury is not contrary to the manifest weights of the evidence.

Taken with the case was plaintiff's motion to dismiss as a "use plaintiff" the Niagara Fire Insurance Company. The effect of such dismissal is to reduce the amount of

the judgment in the sum of $4,873.05. The motion is allowed and the judgment ordered reduced in said amount.

The judgment of the trial court is affirmed, but the cause is remanded with directions to enter judgment in the amount due by reason of the dismissal of the party plaintiff pursuant to motion.

Affirmed as modified.

SMITH and CRAVEN, JJ., concur.