Robert Cobb et al., Plaintiffs-Appellants, v. Marshall Field & Company, Defendant-Appellee.

**Gen. No. 47,436.**

First District, First Division.
June 15, 1959.
Released for publication July 23, 1959.

145

J. W. Horwitz, of Chicago (George W. Angerstein, Sidney Z. Karasik, of counsel) for appellants.

Albert M. Howard, of Chicago (Charles D. Snewind, of counsel) for defendant-appellee.

JUSTICE DEMPSEY delivered the opinion of the court.

This was an action for the personal injuries sustained by the plaintiffs as passengers in the freight elevator of the defendant. The verdict was for the defendant and the plaintiffs appeal from the order denying their motion for a new trial.

The case was tried under the doctrine of *res ipsa loquitur* and the principal issues arise from the application of that rule and the claim that the verdict was against the manifest weight of the evidence.

All the passengers were employees of an independent contractor, J. B. Noelle Company, and were engaged in painting the interior of the defendant's Chicago store. Many of them had worked at Field's for several years and had ridden on this elevator hundreds of times. About 6 p.m., Saturday, February 12, 1955, the painters gathered on the 13th floor of the main store where the Noelle firm had a locker room and kept much of its equipment. After changing clothes the men entered the elevator identified as No. 2; they were to go to the basement and then cross through a subway to the Men's Store, where their work was to be done.

Their foreman, George Pasaka, who had operated this elevator many times before, did so this night. He testified he had authority from his employer, Noelle, to use the elevator after store hours. He tested the brake near the 12th floor and stopped or slowed the car. Between the 10th and the 7th floors he tested the brake again, but this time the car did not stop. As

it kept falling he yelled, "I have no brakes. This is it!"

The six occupants of the car who testified generally fixed the 10th floor as the start of the fall. It was 164 feet from the 10th floor and 120 feet from the 7th floor to the basement. The duration of the fall was estimated from 2 to 6 seconds. One plaintiff said he felt he was in space and that the car bounced when it struck. Another said the car fell from under him and crashed at 50 miles an hour. Two of the three witnesses testified the elevator went 3 or 4 times faster than ever before; but one of these, in a deposition, had said it took 25 to 30 seconds to go from the 9th to the 1st floor.

Two steel bumper plates underneath the car were bent. At the bottom of the basement there was a one-fourth inch steel cover over a deep pit. This cover was supported by steel channels and on it were buffer springs. The pit cover, one or two channels and two springs were damaged. The channels and springs were replaced. The back door of the car and two tracks for this door, which extended beneath the car, were also bent. The repair bill was $588.00.

The defendant employed 25 men to maintain its elevators. Elevator No. 2 was inspected each day. Brake tests were made periodically and the brakes were taken apart twice a year. An inspection also was made after the accident. No repairs were needed or made to the brakes, brake bands, safety device, cables, motor or speed governor. Tests were made with loads up to 1,665 pounds above capacity. The elevator worked and braked perfectly.

An examination had also been made a few days before the accident by two inspectors of the City of Chicago. It was their task to inspect each elevator every six months and the previous inspection was in August, 1954. In the first week of February, 1955,

149

they had examined every part of the machinery, motor and brakes. They rode on top of the car as it descended and looked over the cables, rails and the parts of the car fitting into the rails. They approved it as a safe-operating elevator. After the accident the same City inspectors made another examination. They found nothing wrong and again approved the elevator.

■ A certificate of inspection is issued by the City which bears the weight capacity of the elevator as set by the manufacturer. The certificate last issued was posted in elevator No. 2. Only one plaintiff was asked about this and he acknowledged that he had seen it. The plaintiffs object to this certificate having been received in evidence. It was the owner's notice to the public, as well as the City's certification, that the elevator complied with the municipality's standards; it was also notice that there was a limit to the weight which could be safely carried; it was in the elevator at the time of the accident; there had been considerable preliminary testimony about it and a proper foundation had been laid. We think it was admissible. Krueger v. Friel, 330 Ill. App. 557.

The floor area of the elevator was a little under 8 feet by 8 feet. Twenty-one men and three hand trucks, each about 3 to 4 feet long and 2 to 2½ feet wide, occupied this space. The trucks were loaded with painting equipment including various sized drums and cans of paint, plaster and calcimine. The trucks and the equipment were weighed after the fall and came to 2,110 pounds. The weight of the 21 men was estimated to be from 150 to over 200 pounds each. The total weight on the elevator was more than 5,600 pounds. The posted capacity was 3,500 pounds.

Elevator No. 2 had three braking systems. Only one was controlled by the operator; this had dual action, electrical and mechanical. When the control lever was pulled to the braking position, the electric current

150

would be disconnected, and the motor at the top of the shaft would act as a dynamic brake; at the same time brake drums, working similarly to automobile brakes, would bring the wheels, turned by the motor, to a stop. A cable ran over these grooved wheels and was attached to the car; this cable raised and lowered the car. The second system worked identically as the first except, instead of the operator turning off the power, this was done by safety switches located near the bottom and top of the shaft. The purpose of this system was to prevent the elevator from going too low or too high in the event the operator became incapacitated. The third system was an automatic device underneath the car. It consisted of clamps which could be forced by springs to grasp the two rails upon which the car ran. This emergency device was designed to stop the elevator if it attained too great a speed. The normal speed was regulated by the motor and was 350 feet per minute. This automatic brake was controlled by a governor and was set to work if a speed of 420 feet per minute was reached.

Because this automatic brake was in good condition both before and after the accident, and because it did not go into use as the car fell, it was the conclusion of the witnesses for the defendant that the car had never gone as fast as 420 feet per minute. These witnesses, experienced elevator men, estimated the speed to be from 100 feet to 250 feet per minute, or from 1 to 3 miles per hour. The estimates were based upon the elevator's braking systems, the weight in the car and the damage done to the bottom of the car and the cover of the pit.

The defendant's theory of the accident was that the first brake, controlled by the operator, worked properly and shut off the motor and stopped the wheels, but that the weight in the car was so great that the cable attached to it kept slipping around the stopped wheels,

151

and, although the fall was retarded by the braking action, it could not be entirely restrained; that the safety switch, at the lower end of the shaft was tripped as the car passed it, but this had no effect because the motor was already stopped, and that the third brake never went into operation because the car did not go fast enough to cause it to do so.

At the conclusion of all the evidence the court stated that it would favorably consider a motion for a directed verdict for the defendant unless the complaint, which alleged general negligence of the defendant in permitting the elevator to drop out of control, was amended to charge specific acts of negligence. In compliance with the court's admonition the defendant was then charged with improper inspections, inadequate safety devices, careless maintenance and inspection of the safety devices, failure to provide adequate notice of the elevator's capacity, failure to test the capacity and failure to provide an experienced operator. Subsequently, the court entered this order:

". . . Plaintiff's evidence did not sustain their complaint of general negligence against the Defendant in the operation, control and maintenance of its elevators unless Plaintiffs filed an amended complaint alleging specific negligence in the control, maintenance and operation of the elevator, and the Court overruling Plaintiff's contention that the Doctrine of *Res Ipsa Loquitur* applied or is operative in case at bar because, in the view of the Court, evidence was introduced by the Defendant raising jury questions as to proximate cause and contributory negligence, . . . ."

The plaintiffs argue that they had presented a case under *res ipsa loquitur* and that it should have been submitted to the jury upon this theory.

The classical definition of *res ipsa loquitur* is that given by Erle, J., in Scott v. London Docks, 3 Hurl. & Colt. 596:

"Where the thing is shown to be under the management of the defendant or his servants, and the accident is such as in the ordinary course of things does not happen if those who have the management use proper care, it affords reasonable evidence, in the absence of explanation by the defendant, that the accident arose from want of care."

██ We believe the necessary elements for a *res ipsa loquitur* case were established by the plaintiffs' evidence. The elevator was under the management of the defendant and certainly the occurrence was one which does not happen in the ordinary course of events. Elevators which are correctly constructed, kept in repair and adequately inspected normally do not fall. When one does there is a reasonable inference of negligence. Owners of elevators which carry passengers are common carriers. Several Illinois cases hold, apart from *res ipsa loquitur*, that if a passenger is injured while being transported by a common carrier the happening of such an accident is sufficient to justify a verdict for the passenger and that the burden then shifts to the defendant. Chicago City Ry. Co. v. Eick, 111 Ill. App. 452; New York C. & St. L. R. Co. v. Blumenthal, 160 Ill. 40; Springer v. Ford, 189 Ill. 430; Hefferman v. Mandel Bros., 297 Ill. App. 272; Carson v. Weston Hotel Corp., 351 Ill. App. 523.

██ As a common carrier the defendant was required to exercise the highest degree of care for the safety of the persons riding in its elevators and had the duty of furnishing cars which were safe and which were equipped with protective appliances. Hefferman v. Mandel Bros., Inc., supra; Krueger v. Richardson, 326 Ill. App. 205. The fact that someone else had taken over the use and operation of the elevator after the regular store hours did not relieve the defendant of this responsibility. The usual requirement that the accident-causing instrumentality must be under the ex-

clusive control of the defendant need not mean actual physical control at the time of the accident, if the instrumentality is one which it is the defendant's responsibility to maintain at all times and which responsibility cannot be delegated by consent, agreement or usage. 28 I. L. P. § 203; 37 Calif. L. Rev. 183; McCleod v. Nel-Co. Corp., 350 Ill. App. 216, 112 N.E.2d 501.

■■■■■ The order also said that the *res ipsa loquitur* doctrine was not operative because the defendant raised the questions of proximate cause and contributory negligence. We agree with the court that these were jury questions. But we do not think that the *res ipsa* doctrine became inapplicable just because the defendant introduced such evidence; it was for the jury to weigh this evidence as well as all evidence conflicting with or lending support to the permissible inference of negligence.

The court appears to have followed the rule stated in Bollenbach v. Bloomenthal, 341 Ill. 539 (1930). There the court said:

"The presumption or inference of negligence raised by application of this doctrine [*res ipsa loquitur*] is not absolute or conclusive but is rebuttable, and vanishes entirely when any evidence appears to the contrary."

Although the court mentioned "presumption or inference," the opinion discussed only the presumption and treated it as an inconclusive presumption of law, or as a rule of evidence, which prevails only in the absence of contrary evidence. IX Wigmore, § 2491. The words in Bollenbach, "The presumption or inference . . . vanishes entirely when any evidence appears to the contrary" are frequently quoted and have caused much difficulty. If taken literally they could lead to absurd results. The strongest case for a plaintiff could be nullified by the weakest evidence of a defendant.

Opinions have followed, avoided and differed with Bollenbach: Kerwin v. Stonington Elevator Co., 291 Ill. App. 471 (1937); McNulty v. Reinert, 305 Ill. App. 625 (1940); Johnson v. Stevens Bldg. Catering Co., 323 Ill. App. 212 (1944); Krueger v. Friel, 330 Ill. App. 557 (1947); Kirchner v. Kuhlman, 334 Ill. App. 339 (1948).

 In a *res ipsa loquitur* case there is an inference of negligence arising from circumstantial evidence. Although this is often called a "presumption" it is in reality a presumption of fact and not of law. Such an inference, or presumption, does not disappear when contrary evidence appears; it remains to be considered with all the other evidence in the case and must be weighed by the jury. Prosser, 20 Minn. L. Rev. 241; Feldman v. Chicago Rys. Co., 289 Ill. 25. This inference may be weak or strong depending upon the facts in each case. It is especially strong in passenger-common carrier cases. While the inference may be overcome, nevertheless it is sufficient, except under the most extraordinary facts, to take the case to the jury. Some courts have held that there can be no directed verdict for the defendant in a *res ipsa* case. O'Hara v. Central Ill. Light Co., 319 Ill. App. 336.

 We believe that the inference of negligence arising from the elevator's fall, strengthened as it was by the common carrier and passenger relationship, compelled the submission of the issue of general negligence to the jury.

 It does not appear, however, that the plaintiffs were prejudiced in any way by amending the complaint. The count of general negligence was neither withdrawn nor stricken; the allegations of specific negligence were just added to the complaint and the case went to the jury on both charges. Although this may have been inadvertent, the plaintiffs were unharmed by it and it was not error. While some cases hold that

155

general negligence cannot be combined with specific negligence, that the former must give way to the latter, there is authority permitting both in one complaint. Jackson v. 919 Corp., 344 Ill. App. 519, 101 N.E.2d 594; O'Rourke v. Marshall Field & Co., 307 Ill. 197, 138 N. E. 625; Burdette v. Chicago Auditorium Ass'n, 166 Ill. App. 186; Berent v. Metropolitan Life Ins. Co., 279 Ill. App. 430; Krueger v. Richardson, 326 Ill. App. 205; O'Hara v. Central Ill. Light Co., supra.

 The plaintiffs complain, however, that the court did not instruct the jury upon the *res ipsa loquitur* doctrine and refused four of their instructions which presented this issue. Of the four instructions two differed from a given instruction in that they used the words "maintenance and control" while the given one used the single word "maintenance." Words like management, maintenance, control or possession have been used interchangeably in *res ipsa* cases. Dean Prosser has advocated discarding the idea of "control" altogether. 37 Calif. L. Rev. 199. The jury was instructed that it was the duty of the defendant to exercise the highest degree of care in the maintenance of the elevator, and if they found it had not done so and if the plaintiffs were injured as the result of this, the defendant should be found guilty. The word "control" in the refused instructions could be misleading and confusing under the facts of this case. It did not distinguish the general control resting in Marshall Field from the particular control assumed by the Noelle Company and the Noelle employees the night of the accident; nor did it discriminate between either of these and the actual control of the elevator by the operator, or the right of control over him, or the handling of the controls by him. These instructions were properly refused.

 The third refused instruction said the negligence of the operator was not attributable to a passenger or an invitee, where there was no right of con-

156

trol over the operator or the elevator. No companion instruction was tendered defining an invitee. The instruction was correctly refused. Besides, the court gave a comparable and more favorable instruction which said that the negligence of the operator was not attributable to the riders where the riders have, but do not exercise, control over the operator or elevator.

The fourth instruction spoke of the negligence on the part of the servant of the defendant in operating the elevator. There was no evidence that Pasaka was the servant of Marshall Field and there was no evidence that he was negligent in the way he operated the elevator. The court was right in refusing this instruction.

Nowhere among the refused instructions is there one defining the doctrine of *res ipsa loquitur*. There is none which told the jury that, if they thought the evidence justified it, an inference (or a presumption) of negligence might be drawn from the happening of the accident, and that such an inference is rebuttable. McCleod v. Nel-Co. Corp., supra. It was during the conference on instructions that the court advised amending the complaint; all of the plaintiffs' instructions should have been available. If correct instructions were tendered and refused there would be merit to the plaintiffs' contention that the court erred in instructing the jury, but a party cannot raise on appeal the failure to give instructions if he does not offer them. Chapter 110, § 67(3), Ill. Rev. Stat. 1957; Beckstrom v. Montgomery Ward & Co., Inc., 20 Ill.App.2d 353, 156 N.E.2d 230.

The plaintiffs also criticize an instruction given in behalf of the defendant, which said that if the jury believed that the elevator was overloaded, and that this was the proximate cause of the accident, and if the defendant was not guilty of the negligence claimed by the plaintiffs, the defendant should be found not guilty. In the cited case of Duffy v. Cortesi,

2 Ill.2d 511, the plaintiff, a five year old child, was injured and her grandmother was killed by a motorist, as they crossed a street. An instruction was held to be error which brought into the case a new issue, the negligence of a third party, the grandmother, when the only person who could have caused the injury was the defendant. This was but one of several criticisms made of the instruction. In the present case no new issue was injected by the instruction; the issue of overloading was in the case. This instruction also included these qualifying words, which did not appear in the Duffy instruction, ". . . if the defendant was not guilty of the negligence claimed by the plaintiffs. . . ." Under the facts in this case it was not error to give this instruction.

It was for the jury to decide if the inference of the defendant's negligence was to prevail over the defendant's proof of its carefulness. It was for the jury, if they found that the car was overloaded, to say whether, in the light of all the evidence, it could be reasonably inferred that the excessive weight in the car was the proximate cause of its falling and if the plaintiffs in part, and their fellow employees were responsible for this. "The very essence of its [the jury's] function is to select from conflicting inferences and conclusions that which is considered most reasonable." Tennant v. Peoria, 321 U. S. 29; Dowler v. New York C. & St. L. R. Co., 5 Ill.2d 125. It was also for the jury to decide if the plaintiffs' injuries resulted from their failure to use ordinary care for their own safety; whether the plaintiffs should have reasonably known of danger in riding in the car under the conditions prevailing, whether failure to know of the danger constituted contributory negligence, or whether, if they knew of the danger, their conduct after they knew it constituted such negligence. 65 C. J. S. § 257.

The verdict was not against the manifest weight of the evidence. The defendant's evidence

showed that in the maintenance of elevator No. 2 it did all that could be humanly expected to provide a safe conveyance; its inspections were thorough, rigid and frequent. It furnished an elevator which had an overweight tolerance of at least 1,665 pounds above the recommended limitation. Although it did not supply an operator, this was not shown to have been negligent. The Noelle foreman was experienced and competent. He may have been careless in other respects, but there has been no hint of his negligence in using the controls. No great skill or training is needed to run an elevator. Indeed, two of the plaintiffs had operated the same car on other occasions. Field's had no obligation to maintain a guard at each floor to prevent the elevator from becoming overloaded. Reasonable men are expected to act in a reasonable manner.

One plaintiff was the last man to board the elevator; another must have been one of the very last because he was standing next to Pasaka and related what Pasaka did with the controls; a third was in the middle of the car. They said they did not put the trucks on and did not know who did. All witnesses agreed that no employee of Field's was around. The conclusion is inescapable that Noelle employees were responsible. One plaintiff said he saw the loaded trucks on the car and two said they did not, but these two had seen the trucks near the elevator before they got on. One plaintiff said the car was crowded; two said it was not. One of their witnesses testified it was "awfully crowded." Pasaka, the foreman, had said in a statement the day after the accident, "I knew I had quite a load on the elevator." Either apprehension or caution caused him to test the brake twice as the car descended.

■■■ It was the plaintiffs' overall burden to establish the general or specific negligence of the defendant by a preponderance of the evidence. It was not enough for the plaintiffs to prove they were injured or that they were injured because of the negligence of some-

one. It was incumbent upon them to prove that the negligence of the defendant caused their injuries. There was ample evidence to justify the jury's conclusion that they had not done so.

We have considered all the other points raised and we do not believe they are of merit. The judgment of the trial court is affirmed.

Judgment affirmed.

McCORMICK, P. J. and SCHWARTZ, J., concur.