CLARENCE ESTELL, Plaintiff-Appellant, *v.* FLOYD S. BARRINGER, Defendant-Appellee.

(No. 11220;

Fourth District—February 1, 1972.

*Rehearing denied March 2, 1972.*

MORAN, J., dissenting.

McGrady, Madden & Watson, of Gillespie, (D. A. McGrady, of counsel,) for appellant.

Horsley, Kimble, Lott and Surman, of Springfield, for appellee.

Mr. JUSTICE MILLS, delivered the opinion of the court:

This is a medical malpractice case in which the theory of the plaintiff-appellant is apparently: "The law *ought* to be * * *."

But—in Illinois, it isn't.

As originally filed, the case was constructed on three footings— *res ipsa loquitur*, negligence and lack of consent. The trial court dismissed the *res ipsa* theory and the case went to jury trial on the remaining two theories. At the close of plaintiff's evidence, the court directed a a verdict in favor of defendant, and this appeal follows. The question as to lack of consent is not raised, and we are faced squarely with the questions: Does the doctrine of *res ipsa loquitur* apply to this medical malpractice action, and did the trial judge properly grant a directed verdict on the negligence issue?

The medical testimony in the record before us comes from two neuro-surgeons, the defendant himself (called under Section 60 of the Civil Practice Act) and Dr. Ruge (a medical expert designated by the court under Illinois Supreme Court Rule 215). Consequently, the lengthy transcript and record is a morass of hypertechnical and complex exercises in medical semantics. We will attempt to narrate as concisely as possible the professional history spread out before us:

The plaintiff was first seen by Dr. Barringer in 1955, upon a referral from plaintiff's hometown local physician. The major complaint was that of pain to the left side of his face; sharp paroxysms of pain were triggered by the most common of movements such as lying down, straining, lifting, yawning, eating, sneezing, coughing or touching the face. After taking a complete medical history, Dr. Barringer then examined the 49-year-old plaintiff, and the results of that entire examination were related in the most exact *minutia* in the doctor's Section 60 testimony. Dr. Barringer testified that it was very difficult to be specific in this case, since the symptoms might fit Horton's syndrome, were possibly indicative of a carotid aneurysm and suggested the possibility of dental infection. In any event, the diagnosis was that of atypical left facial neuralgia. Dr. Barringer's medical advice was for a thorough dental examination, and if that proved negative then vitamin B-12 shots; if that in turn did not prove satisfactory then to be followed by progressively larger dosage

shots of histamine, and if this did not afford relief then alcohol injections of the trigeminal nerve. Dr. Barringer sent his report advising these conservative measures to plaintiff's family physician and it was not until nearly a year later that plaintiff was referred back to Dr. Barringer for possibility of alcohol injection. This was performed by Dr. Barringer on the infraorbital nerve with satisfactory results of desired numbness. There was then a lapse of over five years before plaintiff came to see Dr. Barringer again. A complete neurological examination was again made and from the history given by plaintiff the pain in the left cheek had steadily become more severe as well as having spread up into the left eye and forehead. The diagnosis was again trigeminal neuralgia, probably caused by a left carotid aneurysm. Plaintiff was admitted to the hospital for further study and for a left carotid arteriography. That test proved to be normal and Dr. Barringer ruled out aneurysm as well as the possibility of tumor or any other disease. Again, for the relief of pain, alcohol injection was resorted to with satisfactory and desired effect of numbness. This was followed by histamine desensitization. Plaintiff was discharged, and it was not until five months later, in March of 1962, that plaintiff returned to Dr. Barringer's office with complaints of very severe pain. Dr. Barringer then suggested that he enter the hospital for surgery—a trigeminal rhizotomy. At that time Dr. Barringer advised the plaintiff that "we'd tried everything else and there was only one thing left, that was to do an operation." Dr. Barringer testified that on the numerous visits that he had had with the plaintiff in the past he informed plaintiff that he was anxious to try conservative measures first, because of the entire risk of operative procedure—being "a paralysis of the left side of the face, the eyelid included." Dr. Barringer, however, did not advise the plaintiff that there might be some loss of hearing or equilibrium, since he stated he had no reason to anticipate loss of either sense. Dr. Barringer described in minute detail the operation that he was about to perform, the alternative type procedures, the various medical options as to methods of surgery, pros and cons of one approach over the other and the various risks involved. He chose to perform a trigeminal rhizotomy via posterior fossa operation to sever the fifth nerve for the purpose of producing numbness to the left side of the face, thus reducing or eliminating the pain. The operation itself requires cutting back over the cerebellum, depressing seventh and eighth nerves in order to get down to the fifth nerve. Following the operation, plaintiff suffered paralysis of the face, loss of left eyelid control, loss of hearing in the left ear and some loss of sense of balance.

Dr. Barringer testified that "Six per cent of the cases of trigeminal surgery in the hands of Dr. Max Minor Peet, one of the finest in this

country, at the University of Michigan, ended up in facial paralysis, and this is the standard in the field, and because of this, we certainly want to postpone surgery. We have no idea—there's no theory been proved—nor known facts to prove any connection between those particular nerves." He further testified from his records that he had seen 417 cases of trigeminal neuralgia in his practice, personally performed 13 temporal retrogasserian neurectomies, and 18 posterior ones (as performed here). He had had only 2 cases of facial paralysis resulting after the temporal approach, and the case at bar was the only one where facial paralysis occurred after the posterior avenue was utilized. He testified that he had no opinion as to why or what could have caused the facial paralysis here although there could be several speculative theories, one being the depression or stretching of the seventh nerve during the course of the posterior fossa rhizotomy.

"MR. McGRADY: Doctor, based upon a reasonable degree of medical certainty, could you tell us how, if in any way, the seventh nerve would be involved in posterior fossa rhizotomy?

\* \* \*

"DR. BARRINGER: The facial nerve is in the field of surgery in the posterior fossa rhizotomy. It could be stretched, causing the facial paralysis. It could be that the facial nerve was already, previously injured by some disease process, and inflammation—Bell's palsy is the most common cause of facial paralysis. It could be a vascular disease— a thrombosis condition. As shown in this man from the very beginning, this was atypical. Then he had a third nerve paralysis, which cleared up—we never did have an explanation for that. This indicates a disease in the brain stem area again, in the same region. There's a possibility of even a tumor in the posterior fossa—however, we found none. This was one of the reasons to go ahead in performing the operation, we might conceivably find a tumor here. There's a possibility of the nerve being hooked around one of the blood vessels there—that can cause pain. This is but one theory of the cause of trigeminal neuralgia for many years—those are some of the theories.

"MR. McGRADY: Now, doctor, could this account for the condition in which Mr. Estell now finds himself?

\* \* \*

"DR. BARRINGER: Yes. Any one of these could have produced the result."

The only other medical expert testimony that was furnished upon the trial of this cause came from a Dr. Ruge, an impartial neurosurgeon appointed by the court under Illinois Supreme Court Rule 215(d) on the original motion of plaintiff-appellant. No question whatever was raised

as to the neurosurgical expertise of Dr. Ruge who examined the plaintiff three months before the trial. His evidentiary deposition was duly read into the record after the trial court had ruled on certain objections therein.

Dr. Ruge, as laconicly stated as possible, testified thusly: there are numerous methods used by neurosurgeons in performing a trigeminal operation, the one employed here being one of the most common; a severing or dividing of the nerve fibers necessarily results in a loss of sensation or numbness, "and this is sort of the old classic idea"; there have been attempts at relieving trigeminal pain without substituting numbness and this area has produced considerable discussion among neurosurgeons to the point that the question has never been settled; he had personally performed posterior fossa trigeminal nerve operations and in none of those operations had he experienced the patient losing control of the eyelid; he would advise a patient of risks in this type operation but it would depend upon the type patient involved since some "are not going to be emotionally able to accept it," and "if something is very rare, I don't feel compelled to go into all of the minutiae"; the result here is rare and it is not always psychologically advisible to tell a patient of all the potentials; loss of control of the eyelid "could or might have been" connected with the operation, "but I don't know that that is the case"; he didn't think that anyone could answer whether a difficulty with sense of balance could result from this operation, "I don't know"; the patient has pain but the doctor does not know what the real cause of the pain is; but he does not believe that there is any connection between existing pain and the seventh and eighth cranial nerves.

With this, plaintiff rested.

■■ Now to the issues. Did the trial court err in dismissing the *res ipsa loquitur* theory in the case before us? We think not. There is no particular magic in the phrase *res ipsa loquitur*. It is simply a form of circumstantial evidence which relies upon the mundane and commonplace understandings of mankind for its use and employment, and is only applicable where the particular facts themselves create and justify an inference of negligence. To summarize what appears to this court to be the consensus of Illinois case law, the *res ipsa loquitur* doctrine in Illinois is applicable in a medical malpractice case where the conduct of the doctor is so grossly remiss as to fall within the common knowledge of a layman, or is so contrary to acceptable and customary medical practices and standards shown of record, that the results or injuries complained of would not have occurred but for negligence in the performance of such conduct. And this is not the rule itself, but is rather an exception. The general rule in medical malpractice cases is that the burden is upon plaintiff to prove by expert testimony the proper standard of care imposed upon defendant, and to

then prove by affirmative evidence an unskilled or negligent failure to comply with such professional criterion, such acts or omissions thus resulting in the injury to plaintiff. If plaintiff fails to prove any of these elements, plaintiff's burden has not been met and no case has been presented for jury deliberation. The recognized exceptions to this general rule have been variously referred to as "common knowledge", "gross negligence", "palpably negligent", "grossly apparent" or where the negligence of the doctor is so obvious, or the remedy so mundane, as to be within the everyday ken of the layman. The basic rule and its exceptions have been fully enunciated and discussed in recent decisions of this court and other reviewing courts of this state. *Comte v. O'Neil,* 125 Ill.App.2d 450, 261 N.E.2d 21; *Dimitrijevic v. Chicago Wesley Memorial Hospital,* 92 Ill.App.2d 251, 236 N.E.2d 309; *Scardina v. Colletti,* 63 Ill.App.2d 481, 211 N.E.2d 762; *Graham v. St. Luke's Hospital,* 46 Ill.App.2d 147, 196 N.E.2d 355; *Gault v. Sideman,* 42 Ill.App.2d 96, 191 N.E.2d 436.

■■ We have purposefully set forth in exhausting detail the pertinent testimony of Drs. Barringer and Ruge. The qualifications of these neurosurgeons are in no way questioned and their respective testimonies are not at variance in any significant or pertinent way. And although Dr. Barringer was called under Section 60 of the Civil Practice Act as an adverse witness, plaintiff is bound by his testimony since it stands uncontradicted and unrebutted. (*Piancentini v. Bonnefil,* 69 Ill.App.2d 433, 217 N.E.2d 507, 514; *Kapraun v. Kapraun,* 12 Ill.2d 348, 146 N.E. 2d 7, 11.) And no offer of additional or contrary medical proof was tendered by plaintiff at any time during the progress of this case. We have combed this record and the only medical testimony before us, and we conclude that it is apparent that under the general rule and exceptions above set forth, there can be no recovery. Indeed, the posterior fossa method used here to perform the trigeminal operation was one of the most common. Both doctors testified that the injuries suffered by plaintiff were rare and they could not explain the cause of such injuries, although there could be several speculative explanations. There is no evidence whatever in this record that Dr. Barringer breached a proper standard of conduct or failed to conform with the accepted practice in this area. In short, as we observed in *Comte v. O'Neil, supra,* "No standard contrary to what the defendant did was established by the evidence."

Nor can we accept plaintiff's argument that the facts before us fall within the exceptions to the general rule. We view it as completely untenable to argue here that "\* \* \* the negligence is so grossly apparent or the treatment is of such a common occurrence that a layman would have no difficulty in appraising it." *Graham v. St. Luke's Hospital, supra.*

■■ Conclusion: we hold that plaintiff has failed to prove by affirmative evidence that the defendant doctor was either unskillful, negligent or otherwise violative of any accepted medical standard, or that Dr. Barringer's lack of either skill or proper care caused the plaintiff's injury. And since in our view the *Pedrick Rule* has been met and the evidence before us could never sustain a contrary verdict, the trial court properly directed verdict in favor of defendant.

Judgment affirmed.

SMITH, P. J., concurs.

Mr. JUSTICE MORAN, dissenting:

Plaintiff argues that the trial court erred in dismissing and in refusing to reinstate that part of his complaint which predicated liability upon the *res ipsa loquitur* doctrine. The pleading had been dismissed prior to trial, and immediately prior to the beginning of trial the plaintiff moved to reinstate the pleading on the theory that the judge assigned for trial was not the same judge who had dismissed the pleading. Other happenings during the trial indicate that plaintiff was prevented from presenting this theory at the trial. The defense, objecting to comments made by the plaintiff's attorney in his opening statement to the jury on the ground that the case supported a *res ipsa* theory, stated:

"It has been decided by this court that the doctrine is not applicable and now he is arguing control and they did not know what happened, and that's not the doctrine applicable and he should not be allowed to discuss *res ipsa loquitur* with the jury."

Later, in a conference outside the presence of the jury at which the trial court ruled that part of Dr. Ruge's deposition would be excluded from evidence, the attorney for the plaintiff stated: "We are also submitting again that we have been ruled out in this case by the court on a *res ipsa* theory * * *." Then again, in the arguments on a motion for directed verdict, the defendant's attorney began his reply by noting that "the bulk of Mr. McGrady's argument is that *res ipsa loquitur* should be applied in this case." He then argued, as he does in his brief, that *res ipsa* is only available where the negligence is so obvious as to place it within the common knowledge of a layman. Plaintiff again claimed error in his post trial motion because of the trial court's exclusion of the *res ipsa* theory. Under the foregoing circumstances the plaintiff has sufficiently preserved this error for review.

I do not believe the homespun description of the *res ipsa* doctrine in Illinois by the majority is accurate. I particularly take issue with the majority's summarization of the doctrine as they apply it to medical mal-

practice cases in Illinois. Three elements are necessary to establish a *res ipsa loquitur* case: (1) The result must be caused by an agency or instrument which is, or has been, within the control or management of the defendant; (2) the result must not be due to any action on the part of the plaintiff; and (3) the result must be one which normally does not occur without negligence in the control or management of the agency or instrument. *Cobb v. Marshall Field & Co.*, 22 Ill.App.2d 143, 153, 159 N.E.2d 520, 524; *Bollenbach v. Bloomenthal*, 341 Ill. 539, 542, 173 N.E. 670, 671.

*Bollenbach v. Bloomenthal*, 255 Ill.App. 305, applied the *res ipsa loquitur* doctrine in a malpractice case against a dentist, saying:

"The defendants in the case at bar undertook to show that they exercised reasonable care in the manner in which extraction of the tooth was performed, but this evidence did not account for the manner in which, nor how, the filing and part of the tooth came to lodge in the throat of the plaintiff. The jury had a right to draw the conclusion from the facts that the defendants had not properly provided against the happening of just such a condition."

*Bollenbach* was reversed by the Illinois Supreme Court at 341 Ill. 539, not on the ground that *res ipsa* did not apply to malpractice cases, but on the ground that the presumption arising from the *res ipsa* doctrine was rebutted by evidence produced by the defendant. The court said at 548:

"The presumption raised in the first instance by that doctrine was rebutted by the evidence produced by the defendant and it could not thereafter be properly applied."

*Bollenbach* was later overruled by our Supreme Court in *Metz v. Central Illinois Gas & Elec. Co.*, 32 Ill.2d 446, which held that the presumption of negligence raised by the doctrine of *res ipsa loquitur* does not simply vanish but remains to be considered with all of the other evidence in the case when contrary evidence is offered by the defendant. It is significant that in overruling *Bollenbach*, a malpractice case, the Supreme Court did not except malpractice cases from the ambit of the *res ipsa* doctrine.

Since plaintiff was compelled to try his case without benefit of the *res ipsa* doctrine to which he was entitled, he was denied his day in court. Therefore, a review of the evidence to ascertain whether his case came within that doctrine is useless, because we really do not know how plaintiff would have presented his case had his hands not been tied by the rulings of the trial court both before and at the time of trial. An offer of proof as suggested by the majority would have been futile under these circumstances.

However, the plaintiff should not have been directed out of court even on the evidence presented. Verdicts should be directed only in those cases in which all of the evidence when viewed in its aspect most favorable to the opponent so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand. *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill.2d 494, 229 N.E.2d 504. The defendant's testimony was somewhat equivocal. For example, he testified:

"* * * I wouldn't have advised him specifically as to the left eyelid, as it is only part of the entire risk of paralysis of the left side of the face. * * * I never had a result like this in a posterior fossa operation. * * * This case is peculiar to my practice and is the only case of paralysis I have had in a posterior fossa operation. * * * I cannot remember that Mr. Estelle had it explained to him specifically that he could lose the use of his eyelid. I did not advise as to loss of hearing and loss of balance, as it is unheard of in this type of operation."

Concerning Dr. Max Minor Peet, the defendant also testified:

"* * * The figures I gave as to Dr. Peet involve all types of surgery to the trigeminal system, none involve the eyelid. I merely gave the figure of 6% paralysis loss of motor functioning."

Defendant testified under Section 60 that he had not previously experienced an inability to close an eyelid in the posterior fossa approach in trigeminal nerve surgery, and that the loss of hearing and equilibrium were unheard of complications in this type of operation. Thus, according to the testimony of an expert (the defendant in this case), this result should never occur in this type of an operation, but it did occur. The following general rule appears at 82 ALR2d p. 1271:

"* * * A study of the cases both pro and con on the application of the doctrine in malpractice actions demonstrates that the doctrine is applicable only where it is a matter of common knowledge among laymen *or* medical men or both that the injury would not have occurred without negligence."

I would remand this case to the Circuit Court of Sangamon County for a new trial.