LEON YBARRA, Plaintiff-Appellant, *v.* ROLAND CROSS *et al.*, Defendants-Appellees.

(No. 58376;

First District (1st Division)—August 19, 1974.

Klohr, Braun, Lynch & Smith, of Chicago (John J. Treacy, of counsel), for appellant.

Kirkland & Ellis, of Chicago (William D. Maddux and Gary M. Elden, of counsel), for appellee Roland Cross.

Lord, Bissell & Brook, of Chicago (Robert B. Austin, Hugh C. Griffin, and Richard E. Mueller, of counsel), for appellee Henrotin Hospital.

Mr. JUSTICE BURKE delivered the opinion of the court:

Plaintiff sued Dr. Roland Cross and Henrotin Hospital for damages because of injuries allegedly sustained as a result of the defendants' negligence. At the close of plaintiff's case the court directed verdicts in favor of both defendants and against plaintiff. From the judgments entered thereon plaintiff appeals.

Plaintiff raises an issue as to the propriety of the trial court directing verdicts in favor of the defendants, relying upon the rule enunciated by the Illinois Supreme Court in *Pedrick v. Peoria & Eastern Ry Co.*, 37 Ill.2d 494, 510, 229 N.E.2d 504, 513-14, wherein the court stated:

> "[V]erdicts ought to be directed * * * only in those cases in which all the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand."

In order to evaluate plaintiff's argument, it is necessary to recount in some detail the relevant evidence adduced at the trial. Plaintiff Ybarra testified that on January 16, 1967, he became sick at work. He stated that he could not pass his urine and he went to see the company doctor who recommended he see Dr. Cross at Henrotin Hospital. Plaintiff saw

Dr. Cross on the afternoon of January 16, 1967, and after the examination returned home. While plaintiff was at home, he was still "suffering little pains in the stomach." Plaintiff testified that thereafter the pains became more severe and he was unable to urinate. He stated that on January 19, 1967, his wife and a neighbor drove him back to Henrotin Hospital. While plaintiff Ybarra was being interviewed by a receptionist at the hospital, he lost consciousness and his next memory was lying in bed in one of the hospital rooms.

Plaintiff further testified that he was informed that an immediate operation was necessary. During the operation a "hole and the tube" were inserted in plaintiff's stomach and a tube inserted in his penis. Plaintiff stated after this first surgery, he thought he saw Dr. Cross on one occasion.

Plaintiff testified that on February 7, 1967, another operation was performed by Dr. Cross. Dr. Cross had called plaintiff's wife and told her that it was necessary that plaintiff have the operation. Dr. Cross did not explain the nature of the second operation to plaintiff. After the second operation, plaintiff had a tube in his abdomen and another one in his penis. Plaintiff testified that he remained in the hospital for several days after the second operation.

Plaintiff testified that at the time he was discharged from the hospital he had one tube in his stomach and one in his penis with a bag strapped to his leg. He was told to see the doctor once a week and he saw Dr. Cross weekly for 4 or 5 weeks. During this period plaintiff was at home and eventually his condition became "worse."

Plaintiff's wife telephoned Dr. Cross on April 6 or 7 and the doctor prescribed some pills for Mr. Ybarra. Plaintiff took the pills and broke out in blisters and was subsequently advised by Dr. Cross to discontinue the medication. Plaintiff testified that Dr. Cross wanted him to return to the hospital but that he was unable to do so.

Thereafter in April, 1967, plaintiff was operated on by Dr. Edwin C. Graf at Presbyterian-St. Luke's Hospital. Plaintiff did not know the nature of this operation and stated that he was hospitalized for several weeks following the operation. Plaintiff further testified that at the time he was discharged from Presbyterian-St. Luke's Hospital, his condition was "pretty good" and subsequently he returned to work.

On cross-examination plaintiff testified that he felt "pretty good" a couple of days after the first operation performed by Dr. Cross at Henrotin Hospital. Mr. Ybarra further testified that a couple of days after his discharge following the second operation performed by Dr. Cross, he felt "pretty good" and even tried to go back to work.

Dr. Roland Cross was called as an adverse witness under section 60 of the Civil Practice Act. (Ill. Rev. Stat. 1973, ch. 110, par. 60.) Dr. Cross testified that he was licensed as a physician in the State of Illinois in 1942 and was Board-certified as a urologist in 1951. In 1967 he was associated with Henrotin Hospital and plaintiff came under his care for urinary retention. Dr. Cross first saw plaintiff on January 18, 1967, and according to the doctor's record, Mr. Ybarra's urine was full of blood. Dr. Cross recommended that plaintiff be hospitalized. Mr. Ybarra was to "think about it" and call back when he was to enter.

On January 19, 1967, Mr. Ybarra was admitted to Henrotin Hospital. At the time of his admission, plaintiff was in the state of acute urinary retention and "could only dribble out urine." There were attempts made to pass a catheter and when these proved unsuccessful, the plaintiff was taken to emergency. Dr. Cross performed a suprapubic cystotomy by means of making an incision in the lower belly and opening up the bladder from above in order to drain it.

Dr. Cross further testified that on January 20, 1967, he performed an IVP (Intravenous Pyelogram) on plaint.ff. This IVP did not shed any light on the nature of the plaintiff's obstruction. Dr. Cross had determined that the location of plaintiff's obstruction was mid bulb (midway between the back part of the scrotum and the anal opening) from the length of the catheters he had attempted to pass.

Dr. Cross testified that after performing the IVP, the course of treatment administered to plaintiff was to determine the degree of plaintiff's obstruction. On January 30, 1967, a urethrogram was performed to determine the area of plaintiff's obstruction and to see the length and severity of the obstruction in order that plans could be formulated to alleviate the obstruction. Dr. Cross described a urethrogram as being a procedure where radio-opaque material is injected into the channel of the patient's penis and then that area is x-rayed and thereby the point of obstruction is delineated. This urethrogram showed a stricture or obstruction at mid bulb, and confirmed Dr. Cross' tentative diagnosis of January 19, 1967.

Dr. Cross further testified that after surgery, he left an order to measure plaintiff's urinary output and that in a case of this nature, the measurement would be made for a day or two after surgery. Dr. Cross then testified as to the specific dates and times at which urinary measurements were made.

The doctor testified that on February 7, 1967, he performed another surgical operation on plaintiff. The purpose of this operation was to cut open the urethral obstruction and place a catheter through that area so that eventually the use of the suprapubic tube could be discontinued.

During this surgery, Dr. Cross was able to place a catheter through the plaintiff's normal channel of his urethra and into his bladder. The patient tolerated this surgical procedure well.

Between the first and second surgery, Dr. Cross had no record of how many times he saw plaintiff. The doctor stated that usually he was in the hospital every day and the hospital record would not necessarily reflect how often he saw Mr. Ybarra. The witness further stated that the hospital records indicated that he saw plaintiff in the hospital on January 19, 20, 23, 24 and February 1, 6, 8 and 10, 1967. In addition, the doctor recalled seeing and performing a urethrogram on him on January 30, 1967.

Dr. Cross testified that he did not employ a urethroscope to explore Mr. Ybarra's urethral canal. The doctor testified that because of the stricture, he would not get enough value from the use of the urethroscope to make it worthwhile.

The doctor stated that plaintiff was discharged from the hospital on February 11, 1967. At that time, plaintiff was not given any particular orders by Dr. Cross other than to come back and see him. Dr. Cross stated that plaintiff remained under his care until April 7, 1967, and that he saw Mr. Ybarra on March 11, 17, 20, 25, 29 and April 3 and 7, 1967. During this period plaintiff was coming along fairly satisfactorily. Dr. Cross further testified that subsequently he had his secretary contact plaintiff's wife and was informed that Mr. Ybarra was going to another physician. Dr. Cross urged the plaintiff to follow through with the doctor because plaintiff was in need of further care. Dr. Cross testified that anybody with a stricture needs to be under a physician's care permanently. Dr. Cross testified that he might have told Mr. Ybarra to flush out his own bladder when he went home from the hospital although the doctor had no recollection or record so indicating.

Dr. Edwin C. Graf was called as a witness by plaintiff. Dr. Graf testified that he was licensed as a physician in the state of Illinois in 1941 and Board-certified as a urologist in 1948. Dr. Graf testified he first saw the plaintiff when Mr. Ybarra was admitted to Presbyterian-St. Luke's Hospital on April 3, 1967. At this time the plaintiff had a urinary fistula draining above his pubic bone. The next day, Dr. Graf examined plaintiff with a cystoscope and found a stricture in the tube that the urine flows through, an obstruction in the area of the prostate gland and a diverticulum in plaintiff's bladder. Two days later, major urological surgery was performed during which the stricture was corrected and the prostate obstruction and the diverticulum of plaintiff's bladder were removed. Dr. Graf stated plaintiff healed with average rapidity and Mr. Ybarra was discharged about 2 weeks after the surgery.

Dr. Graf further testified that there are instances in which a patient will have a catheter both in the penis and in the suprapubic area into the bladder. He further stated that a patient needs attention to check the urine as it flows through the tube. Dr. Graf described the irrigation or flushing procedure utilized in a case such as plaintiff's and testified that in his opinion these procedures could be conducted by a patient at home and did not necessitate hospitalization. Dr. Graf also testified that when he ordered urinary output measurements, the drainage is usually estimated at 6- to 8-hour intervals. Dr. Graf however also testified that the intervals of measuring urine are variable as are the methods of irrigation. Dr. Graf also stated that the plaintiff would have to be treated for strictures as long as he lives.

Plaintiff was recalled as a witness and further testified that at the time he was discharged from Henrotin Hospital, he had one catheter in his penis and one in his stomach. He was not given any instructions as to how he should care for himself at home. Plaintiff further testified that after he was discharged from the hospital, he saw Dr. Cross on one occasion when the doctor gave him a syringe so that he could irrigate himself. Dr. Cross also gave the plaintiff certain written instructions regarding the use of the syringe.

Plaintiff's wife, Julia Ybarra, was called as a witness and testified that she observed plaintiff's condition during the time he was hospitalized at Henrotin Hospital in 1967. She stated that plaintiff was not kept very clean and his bandage was "dried up" and he was "very raw between the legs." The witness further testified that after plaintiff was home, he became very sick and had a "high fever." Mrs. Ybarra called Dr. Cross who prescribed a drug for plaintiff to take. Plaintiff took the drug and then he broke out in blisters. Plaintiff's wife then talked to Dr. Cross who wanted the plaintiff brought back to the hospital. Julia Ybarra stated she was unable to bring the plaintiff back to the hospital because he was running a very high fever and she had no one to help her.

Plaintiff in his complaint and in his brief says that defendant Cross was negligent in numerous respects and specifically was responsible for improper diagnosis, failure adequately to inform plaintiff of his condition and the procedures to be used in correcting it; improper choice and implementation of medical procedures; and inadequate post-operative care.

In *Scardina v. Colletti*, 63 Ill.App.2d 481, 488, 211 N.E.2d 762, 765-66, this court stated the general rule governing malpractice cases:

> "In a malpractice action a physician will be held responsible for injuries resulting from his want of reasonable care, skill and diligence in his practice. *The plaintiff must prove by affirmative*

*evidence that the defendant was unskillful or negligent and that his want of skill or care caused injury to the plaintiff.* It is not enough to prove that he made a mistake or that his treatment harmed the plaintiff; proof of a bad result or mishap is no evidence of lack of skill or negligence.

*Generally, it is necessary for a plaintiff to show by expert testimony not only that the injury occurred, but that such an event does not ordinarily occur in the normal course of events without negligence.* Graham v. St. Luke's Hospital, supra, pp 156, 157; Gault v. Sideman, 42 Ill.App.2d 96, 101, 102, 191 N.E.2d 436." (Emphasis supplied.)

See also *Dimitrijevic v. Chicago Wesley Memorial Hospital*, 92 Ill.App. 2d 251, 236 N.E.2d 309.

At the trial, plaintiff utilized two expert witnesses, the defendant Cross who was called as an adverse witness pursuant to section 60 of the Civil Practice Act and Dr. Graf. It is significant that Dr. Graf at no time criticized any of the decisions or actions of Dr. Cross. In fact, plaintiff's attorney stated during argument in the trial court that "Doctor Graf did not testify specifically and he didn't have to as to whether or not Doctor Cross did something wrong." In addition, plaintiff's attorney in his appellate brief has stated, "It is not argued here that Dr. Graf in his testimony expressly stated that the defendant doctor was negligent in his care of plaintiff."

■■■ The evidence adduced at trial indicates that Dr. Graf and defendant Dr. Cross utilized different methods of diagnosis and treatment regarding plaintiff. Dr. Graf acknowledged during his testimony that in medical science there is often more than one method to accomplish the same result and that both methods may be considered acceptable medical practices. Simply because Dr. Graf chose to utilize different procedures than those implemented by Dr. Cross does not support an inference that Dr. Cross was unskillful or negligent. Moreover, neither Dr. Graf nor defendant Cross was asked to give an expert medical opinion on any causal connection between any treatment, action, or decision of Dr. Cross and any harm or injury to Mr. Ybarra. We are of the opinion that the trial court was correct in directing a verdict in favor of defendant Cross at the conclusion of plaintiff's case.

As to defendant Henrotin Hospital, plaintiff in his complaint alleged that the hospital was negligent in several respects. However, at the trial and in his briefs on appeal, plaintiff has centered on the allegation that Henrotin Hospital was negligent in that hospital personnel failed to sufficiently record plaintiff's urinary output.

It was plaintiff's obligation to prove that the hospital failed to comply

with the standards of proper care which guide institutions holding themselves out as devoted to the care and saving of human life, and that this failure resulted in the injury or ill-being complained of. *Scardina v. Colletti*, 63 Ill.App.2d 481, 211 N.E.2d 762.

■■ We are of the opinion that plaintiff did not prove that Henrotin Hospital violated the standards applicable to recording urinary measurement. Plaintiff relies heavily upon the statement of Dr. Graf that urinary drainage "is usually estimated at six to eight hour intervals." However, as the trial judge observed, Dr. Graf also testified that the "intervals of measuring urine are variable as are the methods of irrigation." When this evidence as a totality is viewed in its aspect most favorable to plaintiff, it does not, in our opinion, establish a standard which the hospital violated. Moreover, there is a complete absence in this record of any causal connection between the alleged negligent act of omission on the part of defendant hospital and the ultimate condition of illbeing of the plaintiff. (*Wade v. Ravenswood Hospital Ass'n*, 3 Ill.App.2d 102, 120 N.E.2d 345.) Therefore, we sustain the action of the trial court in directing a verdict in favor of Henrotin Hospital.

Plaintiff in his reply brief invokes the doctrine of *res ipsa loquitur* and contends that the alleged negligence of the defendants is "so grossly apparent that a layman would have no difficulty in appraising it."

■■ As this court recently stated in *Slater v. Missionary Sisters Of The Sacred Heart*, 20 Ill.App.3d 464, 469, 314 N.E.2d 715:

> "The doctrine known as *res ipsa loquitur* is an exception to the general rule which governs burden of proof in medical malpractice cases. (*Estell v. Barringer*, 3 Ill.App.3d 455, 459, 278 N.E.2d 424.) It applies where a doctor, nurse or other hospital personnel is so grossly remiss that their conduct falls within the common knowledge of a layman, or is so contrary to acceptable and customary medical practices and standards that the injury complained of would not have occurred but for negligence in the course of such conduct. (*Estell v. Barringer*, 3 Ill.App.3d 455, 459, 278 N.E.2d 424; see Annot., 9 A.L.R. 3d 1315.)"

■■ We do not believe that the conduct of the defendants in this case is within the purview of the "common knowledge" or "gross negligence" exceptions. (*Comte v. O'Neil*, 125 Ill.App.2d 450, 261 N.E.2d 21.) Moreover, there is no proof that either defendant acted contrary to acceptable or customary medical practice and standards; consequently the doctrine of *res ipsa loquitur* has no application in the instant case.

For these reasons, the judgments are affirmed.

Judgments affirmed.

EGAN, P. J., and HALLETT, J., concur.