HARRIET WALSKI, Plaintiff-Appellant, *v.* DR. MARVIN F. TIESENGA *et al.*, Defendants-Appellees.

First District (1st Division)   No. 76-994

Opinion filed September 19, 1977.

Philip Z. Levinson and Jules S. Gershon, both of Chicago, for appellant.

Bernard E. Harrold and Donald M. Flayton, both of Wildman, Harrold, Allen & Dixon, of Chicago, for appellees.

Mr. JUSTICE McGLOON delivered the opinion of the court:

The instant appeal involves an action in malpractice against two

doctors, Marvin Tiesenga and James Walsh, for personal injuries arising from the alleged negligence of the defendant doctors during an operation on plaintiff's thyroid gland. During a trial before a jury and at the close of plaintiff's case-in-chief, the defendants moved for a directed verdict contending that plaintiff had failed to present evidence that the defendants' actions did not conform with the standard of care in the medical community. After hearing arguments on the above motion, the trial court directed a verdict in favor of the defendants. Plaintiff then filed a post-trial motion requesting the trial court to vacate its order granting a directed verdict. The trial court denied this motion. Plaintiff now appeals.

The sole issue in this appeal is whether the testimony of plaintiff's expert witness established the requisite standard of care upon which the defendants' conduct was to be judged.

We affirm.

The plaintiff, Harriet Walski, testified at trial that she had initial surgery on her thyroid gland in 1949. Subsequent to this surgery she received radioactive iodine treatment for her thyroid and took thyroid pills on an irregular basis. In the early summer of 1971 she saw the defendant, Dr. Walsh, several times and complained of difficulty in breathing. After diagnosing that her thyroid was enlarged and was pressing on her trachea, Dr. Walsh arranged for her to have surgery on November 30, 1971, by the co-defendant, Dr. Tiesenga. After this surgery, plaintiff had problems with her breathing and speaking. During a post-operation visit, Dr. Tiesenga informed the plaintiff that a nerve had been cut and that her larynx had been damaged. Dr. Tiesenga said that there was nothing more he could do and advised her to see a throat specialist.

During trial, the plaintiff called Dr. Tiesenga as a witness pursuant to section 60 of the Civil Practice Act. Dr. Tiesenga testified that prior to surgery he was aware of the plaintiff's medical history and in particular the fact that she had had prior surgery on her thyroid gland. Due to this prior surgery, Dr. Tiesenga could not expect to find the anatomical structures in their normal positions. During surgery, Dr. Tiesenga noticed that the thryoid gland was markedly swollen and that there was scar tissue around the gland. He removed tissue from both the right and left side of the gland. Dr. Tiesenga indicated that to either side of the thyroid gland there is a nerve, the recurrent laryngeal nerve, and that he identified the recurrent nerve on the right side but made no attempt to locate the recurrent nerve on the left side. Dr. Tiesenga admitted that the first thing a surgeon should do in performing thyroid surgery is to identify and isolate the recurrent nerve. He explained, however, that he knew the nerves would not be in their normal location due to the prior surgery and that in removing tissue from the left side he made a wide cut so as to avoid the area where the nerve might possibly be. Dr. Tiesenga explained

that this is the most difficult type of thyroid surgery that can be performed, that the nerve is very delicate and could have been injured in an attempt to locate it, and that it was more prudent not to attempt to locate the nerve on the left side. Dr. Tiesenga did not view the patient's vocal chords before or after the operation.

Dr. Tiesenga also indicated that he agreed with the textbook procedure of first exposing and identifying the recurrent laryngeal nerve in those cases where the patient had no previous thyroid surgery.

Dr. Walsh, a general practitioner and surgeon, testified that he treated the plaintiff from June to November of 1971 and assisted Dr. Tiesenga during plaintiff's surgery on November 30, 1971. After detecting that the plaintiff's thyroid was enlarged and pressing on her trachea, Dr. Walsh arranged for the plaintiff to be operated on by Dr. Tiesenga. Dr. Walsh testified that the first thing a surgeon should do in performing thyroid surgery is isolate and identify both recurrent nerves; that Dr. Tiesenga identified with difficulty the nerve on the right side; and that it was impossible to identify the nerve on the left side. When asked if Dr. Tiesenga's procedure of identifying the right nerve and not identifying, but skirting, the left nerve was good practice when compared to the standards of the medical community, Dr. Walsh responded, "I wouldn't know what else he could have done."

Subsequent to the November 30, 1971 surgery, the plaintiff was examined by Dr. Saxon, her family physician and Dr. Kowal, a specialist in the field of otolaryonology. Both doctors diagnosed that the plaintiff had permanent vocal chord paralysis, bronchitis and tracheitis. During trial, Dr. Kowal indicated that he was familiar with the technique in performing thyroid surgery. When asked by plaintiff's attorney whether or not in performing thyroid surgery it is customary to visualize and identify that laryngeal nerve, Dr. Kowal responded: "[T]here are many procedures on the thyroid. And in some cases, you have to identify the nerve, and other cases, you do not."

Plaintiff called as an expert witness Dr. David Berger who performed 180 thyroidectomies within the past nine years. He examined the plaintiff in January of 1976 and found a left vocal chord paralysis. Dr. Berger testified as follows concerning the acceptable procedures for thyroid surgery:

"Well, let me begin by saying that in my feeling the standards by which I feel are acceptable practice, one must identify and preserve the recurrent laryngeal nerves on all occasions when one operates on the thyroid. There are times when identification of the structure is difficult, particularly in those patients who have had previous thyroid surgery and thyroid treatment. It's on these occasions when injury to the nerve is the greatest. However, it's my

feeling that it's on these occasions that one must make every attempt they can to identify the nerve and preserve it for precisely that reason."

Dr. Berger was asked on cross-examination whether the procedure employed by Dr. Tiesenga was a proper option. Dr. Berger responded: "I can only answer it on the basis of my own opinion as to what I consider a proper option."

When asked· on cross-examination if there existed a contemporary school of surgeons that will skirt the nerve when they are running into a host of adhesions, Dr. Berger responded: "* * * [I]n the institutions in which I trained that is not the teaching. And I can't speak for other institutions or other areas of training. I can only speak for my own."

On cross-examination Dr. Berger was also read a quotation from a medical textbook which indicated that there existed a certain amount of controversy in the medical community concerning deliberate exposure of the laryngeal nerve. The quotation concluded with the remark that the situation remained one in which each surgeon will find the approach which suits him best. Dr. Berger indicated that he did not fully agree with that statement, but indicated that it depends on the surgeon and the technique and care he uses. He stated, "Everybody who is a certified surgeon doesn't use the same methods, obviously."

■■ At the close of plaintiff's case the trial court directed a verdict in favor of the defendants. The trial court found that the plaintiff had failed to establish a community standard and a deviation therefrom by the defendants. Except in those situations where the physician's conduct is so grossly negligent or the treatment so common that a layman could readily appraise it (*Lundahl v. Rockford Memorial Hospital Association* (1968), 93 Ill. App. 2d 461, 235 N.E.2d 671), the plaintiff in a medical malpractice action must establish through the use of expert testimony that the defendant physician was negligent in his treatment and that the injuries suffered by the plaintiff were the result of such negligence. (*Borowski v. Von Solbrig* (1975), 60 Ill. 2d 418, 328 N.E.2d 301; *Stogsdill v. Manor Convalescent Home, Inc.* (1976), 35 Ill. App. 3d 634, 343 N.E.2d 589.) It is apparent that the conduct of the defendants is not so grossly negligent or the treatment so common that a layman could readily appraise it. As a result the plaintiff had to establish the defendant's negligence through the use of expert testimony. Such testimony must establish the standards of care against which the defendant doctor's conduct is measured. The plaintiff must then further prove by affirmative evidence that, judged in light of these standards the doctor was unskillful or negligent, and that his want of skill or care caused the injury to the plaintiff. See *Borowski v. Von Solbrig* (1975), 60 Ill. 2d 418, 328 N.E.2d 301; *Estell v. Barringer* (1972), 3 Ill. App. 3d 455, 278 N.E.2d 424.

■■ In testifying as to the acceptable standard of care in the medical community, Dr. Berger was very careful to preface his remarks with "I feel." While it is true that an expert opinion is of essence an opinion, Dr. Berger unequivocally testified that he could not speak for other institutions, only his own. Dr. Berger at no time testified that there was a generally accepted medical standard which required a surgeon to identify and expose the recurrent nerves. Furthermore, considering the other medical testimony given at trial it is apparent that there is a conflict in the medical community concerning whether or not in all cases the recurrent nerve should be identified. Considering Dr. Berger's testimony in its entirety, we do not believe it established the requisite community standard of care. Instead, we believe his testimony indicated only that he would have performed the operation differently. The mere fact that one doctor would have used different medical procedures than the defendant doctor does not support an inference of negligence. *Ybarra v. Cross* (1974), 22 Ill. App. 3d 638, 317 N.E.2d 621.

■■■ In *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504, the supreme court ruled that verdicts ought to be directed when all of the evidence viewed in its aspect most favorable to the opponent so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand. Plaintiff argues, and we agree, that whether or not a doctor has deviated from the standard of care in performing the surgery and whether or not his actions proximately caused the injuries alleged are questions of fact for the jury. (*Borowski v. Von Solbrig* (1975), 60 Ill. 2d 418, 328 N.E.2d 301.) However, before the above issues can be presented to the jury, it is essential that the standard of care in the medical community be established. (*Estell v. Barringer* (1972), 3 Ill. App. 3d 455, 278 N.E.2d 424.) In the instant case the record contains no evidence establishing such a standard and under the rule in *Pedrick* the trial court properly directed a verdict in defendants' favor.

For the above reasons we affirm the judgment of the circuit court of Cook County.

Judgment affirmed.

GOLDBERG, P. J., and LINN, J., concur.